# IN THE UNITED STATES DISTRICT COURT
## FOR THE SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION (CINCINNATI)

|  |  |  |
|---|---|---|
| DINO RIKOS, on Behalf of Himself, all Others Similarly Situated and the General Public, | ) ) ) |  |
| Plaintiff, | ) ) |  |
| v. | ) ) | CASE NO. 1:11-cv-226 (Judge Timothy S. Black) |
| THE PROCTER & GAMBLE COMPANY, | ) ) |  |
| Defendant. | ) |  |

---

## RESPONSE OF CHRISTOPHER T. CAIN IN OPPOSITION
## TO JOINT MOTION FOR APPEAL BOND [Doc. 195]

---

**NOW COMES** Christopher T. Cain ("Cain"), an objecting Class member, and responds to the

Joint Motion for Appeal Bond [Doc. 195] as follows:


Christopher T. Cain, Pro se
SCOTT & CAIN
Suite 601
550 Main Street
Knoxville, TN 37902
Tel: (865) 525-2150


2018 SEP -7 AM II: 12

## TABLE OF CONTENTS

I.     PRELIMINARY STATEMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

II.    STANDARD OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

III.   ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     A.    Cain is a Class Member and Has Standing to Appeal Under Supreme Court
          Precedent and Because All Class Members – Not Just Those Participating in the
          Settlement – Have An Interest in the DHIC DHIC Component of the Settlement
          That Cain Attacks on Appeal . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 5

     B.    Consideration of Relevant Factors for Determining the Propriety of an Appeal
          Bond Weigh Against Imposition of a Bond Here . . . . . . . . . . . . . . . . . . . . . . . . 7

     C.    The Court Should Require an Appeal Bond in the Amount of $1,000, Payable
          Jointly and Severally by the Appealing Objectors . . . . . . . . . . . . . . . . . . . . . . . 13

     D.    The Court Should Deny the Parties' Motion to the Extent They Seek to Include
          Costs Not Enumerated in Rule 39 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          1.    Incremental administration costs may not be included in the appeal
                 bond because there is no underlying rule or statute that permits
                 such costs to be shifted and the parties have not met their burden
                 of properly estimating the costs . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 14

          2.    *In re Cardizem* prohibits "lost interest" from being included in the
                 appeal bond amount in this case absent a rule or statute permitting
                 them to be construed as costs under Fed. R. App. P. 7 . . . . . . . . . . . . . 17

          3.    *In re Cardizem* prohibits prospective attorneys' fees on appeal
                 from being included in the requested appeal bond because there
                 is no underlying fee-shifting rule or statute which permits their
                 inclusion as costs under Rule 7 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

          4.    There is no precedent to warrant inclusion of "double costs" the
                 Sixth Circuit may award in the appeal bond . . . . . . . . . . . . . . . . . . . . . 20

IV.   CONCLUSION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

# I. PRELIMINARY STATEMENT

Christopher Cain, an objecting Class member [Doc. 174], has appealed [Doc. 185] the Court's approval of the class action settlement [Doc. 179]. Before the Court is a joint motion by the parties seeking an order imposing a $561,489.44 appeal bond on Cain and Ms. Gallagher (another objector) who also appealed, purportedly representing: (a) $2,000 in appeal-related expenses taxable under 28 U.S.C. § 1920 and Fed. R. App. P. 39(e); (b) $71,500 in additional claims administration costs; © $429,589.44 in lost interest income that would have inured to the exclusive benefit of the Class and Class Counsel; and (d) projected attorneys' fees of $58,400. [Doc. 195, at Page ID#: 8674].[1]

At the outset, contrary to the parties' argument, Cain does not lack standing to appeal. While the parties suggest Cain's failure to submit a claim with the administrator bars his appeal, this is not so, as the great weight of authority demonstrates that Cain has standing to appeal the Court's final approval of the settlement because he objected to the DHIC component of the settlement (as well as collusion) and that component applied to all Class members, not merely to those who submitted claims. There can be no dispute – and there is none – that Cain's objection showed that he is a Class member.

There are three fundamental issues upon which the parties agree. First, it is within the Court's discretion to require an appeal bond pursuant to Rule 7 securing payment of costs on appeal. Second, it

---

[1] The bond amount is almost *11,400 times* the amount of a Class member's maximum cash refund of $49.26. [Doc. 166-2, at Page ID#: 6894-95].

-1-

is appropriate to include taxable costs under Rule 39(e) within any such a bond. And third, imposition of

an appeal bond in the amount of $1,000.00, payable jointly and severally by the two appealing objectors,

will sufficiently to cover the estimated taxable costs on appeal.[2]

The Court's discretion in setting an appeal bond, however, is not unbounded. Here, the inclusion

of incremental settlement administration costs, interest and attorneys' fees is without merit and would be

in direct conflict with binding Sixth Circuit precedent. Under Sixth Circuit law – and the law according to

the majority of Circuits – absent an applicable cost-shifting rule or statute, only those "costs" enumerated

in Rule 39 are appropriately included in a Rule 7 appeal bond. Because the parties have not identified such

a rule or statute here (nor can they), any estimated costs associated with the administration or maintenance

of the settlement fund, interest, or attorneys' fees cannot be properly included in the appeal bond amount.[3]

Notwithstanding his position that a reasonable bond is appropriate in this instance, Cain also

demonstrates that the factors the Court must consider in determining whether a bond is appropriate actually

weigh against an appeal bond, especially one of such magnitude as that proposed here. What is more, with

respect to the merits of his appeal, it is not the province of district courts to determine whether an appeal

of a final approval order has merit. Here, such a decision rests exclusively with the Sixth Circuit. Even if

---

[2]Cain does not contest this amount (for printing, copying and binding briefs) even though the Sixth Circuit requires electronic-filing of briefs and does not require an appendix, as the parties incorrectly suggest.

[3]In their introduction, the parties cite *Rougvie v. Ascena Retail Grp., Inc.*, No. 15-724, 2016 U.S. Dist. LEXIS 142404, at *2-3 (E.D. Pa. Oct. 14, 2016), where the plaintiffs asked the court to require Cain's client to post a $121,200 appeal bond, including $120,000 for "settlement administrative fees." What the parties neglect to tell the Court is that in *Rougvie*, the court rejected the request for such an exorbitant bond, and ordered Cain's client to post an appeal bond of only $1,235.52. *Rougvie*, at *7, *12-21. The court observed, "[t]his carrot and big stick approach is ***contrary to the right of any disappointed objector to file a notice of appeal***. *Id.*, at *11.

the Court did possess authority to delve into the merits of Cain's appeal, a fair examination of his arguments advanced in the Sixth Circuit appeal demonstrates that his appeal is not frivolous.

Public policy concerns also favor of a minimal bond amount, as requiring too large a bond will have the undesirable effect of "chilling" meritorious appeals. If the staggering $561,489.44 appeal bond is granted, the parties will likely successfully avoid the merits of this appeal and will have provided a roadmap for themselves and others to follow in the future to avoid appellate review on class settlements in this Circuit. As the *Rougvie* recognized, Rule 7 bond is not designed "to impose an independent penalty on the appellant." *Capizzi v. States Res. Corp.*, 2005 U.S. Dist. LEXIS 7338, at *4 (D. Mass. Apr. 26, 2005). Make no mistake, the parties' motion has no plausible motive or effect other than to force Cain to abandon his meritorious appeal. *See In re Countrywide*, 2010 U.S. Dist. LEXIS 131775 (W.D. Ky. Dec. 13, 2010) ("purpose of the appeals process is to permit objectors to challenge such rulings").

The parties support their quest for this large appeal bond by depicting Cain as a serial objector, speculating Cain's motives or history equates to an unmerited appeal. But the parties' assault on Cain demonstrates a fundamental misconception of the importance of objectors in the class action settlement process, as well-recognized by respected jurists and commentators alike.

Cain does not oppose imposition of an appeal bond to secure the actual taxable costs on appeal. Here, the parties have presented no evidence that their taxable costs under Rule 39 could conceivably approach even the sum of $1,000. The only such costs recoverable under Rule 39, and thus allowed in a Rule 7 appeal bond, are the "necessary copies of a brief or appendix," "preparation and transmission of

the record" (the responsibility of Cain), and "the reporter's transcript" (also Cain's responsibility). Yet, the briefs of all parties on appeal must be e-filed. Surely, such costs will not exceed $300, especially since reliable data from the Federal Judicial Center concerning average costs in the Sixth Circuit.

Courts that refuse to impose appeal bonds to cover increased settlement administration costs, interest or attorneys' fees rightly reason that such costs are not "costs on appeal," as they do not fit within the scope of Rule 39(e)'s enumerated taxable costs or a fee-shifting statute in the underlying claim. *In re Cardizem CD Antitrust Litig.*, 391 F.3d 812, 815, 818 (6th Cir. 2004). Certainly, there is no basis for including such costs in an appeal bond in this case, as the only fee-shifting statutes identified by the parties are those governing the claims of Class members from California, Illinois, Florida, North Carolina, and New Hampshire and do not concern Cain's claim as a Class member from Tennessee. The only claim potentially applicable to Cain and other Tennessee class members is the breach of warranty claim applicable to all Class members. [Doc. 165, at Page ID: 6819].

Accordingly, the only basis for requiring Cain to post a bond for those costs is if his appeal is deemed "frivolous." However, contrary to the parties' intimations, Rule 7 does not provide that the Court should consider the merits of an appeal in determining whether to impose an appeal bond. Rather, the question of whether Cain's appeal was filed in bad faith, has any merit or is frivolous is one for the Sixth Circuit, not for this Court, which previously overruled her objections.

## II. STANDARD OF REVIEW

Under Federal Rule of Appellate Procedure 7, "the decision[s] as to the need for a bond and the amount thereof are left to the discretion of the district court." *In re Munn*, 891 F.2d 291, at *1 (6th Cir. 1989); *see also In re Cardizem*, 391 F.3d at 818. The proponents of the bond have the "burden of

-4-

justifying the amount of [his] request or providing a reasonable estimate of the actual costs [he] may incur on appeal." *In re Countrywide Fin. Corp. Customer Data Sec. Breach Litig.*, 2010 U.S. Dist. LEXIS 131775, at \*17 (W.D. Ky. Dec. 13, 2010).

## III. ARGUMENT

A. **Cain is a Class Member and Has Standing to Appeal Under Supreme Court Precedent and Because All Class Members – Not Just Those Participating in the Settlement – Have An Interest in the DHIC DHIC Component of the Settlement That Cain Attacks on Appeal.**

The parties maintain that Cain lacks standing to appeal because he never filed a claim in the settlement. [Doc. 195, at Page ID#: 8672] (citing Hack Decl., ¶¶4-6). To pursue his appeal, the parties maintain, Cain must have Article III standing such that he suffered injury in fact that can be remedied by his requested relief. [Doc. 195, at Page ID#: 8677]. Because Cain "declined to participate in the Settlement," he allegedly "has no stake in it because a favorable outcome on appeal would not redress his purported injury." The parties' standing is well-off-point, goes too far, and should be rejected.

Most importantly, when a class member objects to an undesired settlement approval motion, there is a wide consensus that no Article III injury is required beyond being bound by the settlement's release of claims. *See e.g., Devlin v. Scardelletti*, 536 U.S. 1, 6-7 (2002) (ability of objecting class member to appeal settlement approval "does not implicate the jurisdiction of the courts under Article III of the Constitution"); *id.* at 7 (an objector's "complaint clearly falls within the zone of interests of the requirement that a settlement be fair to all class members").[4] Of the noted cases, *Union Asset* is most directly on point.

---

[4]*Larson v. AT&T Mobility LLC*, 687 F.3d 109, 131 n.34 (3d Cir. 2012) (despite fact that issue complained of did not harm objectors, they "had constitutional standing to make such an objection because they were class members who had asserted that objection to the District Court.") (citing

Plaintiffs there alleged that the objector-appellants had not filed a claim form and thus were deprived of standing to object. The Fifth Circuit squarely repudiated this argument:

> Union alleges that some of the appellants did not file a proof of claim, thereby depriving them of standing to bring their objections. Any class member has standing to object to a class settlement. Filing a proof of claim to the settlement fund is one way, but not the only way, for an objector to demonstrate that he is a member of the class. Here, the settlement notice instructed objectors how to establish class membership, and those requirements, with which the appellants complied, did not demand that they file a proof of claim. The appellants have demonstrated their membership in the class and therefore have standing to bring their objections.

*Union Asset Mgmt.* 669 F.3d at 638-39.

Here, there can be no dispute about Cain's status as a Class member, as he complied completely with the terms of the class notice when he timely filed his objection, including submitting a sworn declaration attesting that he was a Class member and reasons therefor. [Doc. 174].[5]

Furthermore, the exception the parties invoke here does not apply, because it concerns situations in which class members challenge only attorneys' fee awards (and not the underlying settlement) but have no potential financial stake in a reduction in the fee award because they have neither challenged, nor made

---

*Devlin*); *Cobell v. Salazar*, 679 F.3d 909, 919, 400 U.S. App. D.C. 428 (D.C. Cir. 2012) ("Any other conclusion would prove a bitter irony for those who have lost their [chose in action]"); *Union Asset Mgmt. Holding A.G. v. Dell, Inc.*, 669 F.3d 632, 638-39 (5th Cir. 2012) ("Any class member has standing to object to a class settlement."); *United States v. Alabama*, 271 Fed. Appx. 896, 898-99 (11th Cir. 2008) (per curiam); *Rutter & Wilbanks Corp. v. Shell Oil Co.*, 314 F.3d 1180, 1183 & n.1 (10th Cir. 2002) (objectors who have objected to entire settlement are entitled to raise all issues relating to settlement fairness with respect to entire class); *In re Cendant Corp. PRIDES Litig.*, 243 F.3d 722, 727-32 (3d Cir. 2001) (granting standing to appeal fee award when reduction in fees would not benefit appellant class member).

[5]Cain mailed a claim form on or about August 28, 2018, after he became aware of the parties' position that he lacks standing to appeal. [Exhibit 1].

a claim in, the underlying settlement. Cain's objections focused on the propriety of the DHIC awards and collusion, not an attack on attorneys' fees. This distinction makes all the difference for standing purposes. An objector who has refused to participate in the common-fund settlement and who objects only to fees generally will not have standing to appeal the fee award "because he has not participated in the settlement, a reduction in class-counsel fees will not benefit him.'"" *Stetson v. Grissom*, 821 F.3d 1157, 1163-64 (9th Cir. 2016). Such an objector lacks standing because "without a stake in the common fund pot, a favorable outcome would not redress their injury." *Rodriguez v. Disner*, 688 F.3d 645, 660 n. 11 (9th Cir. 2012).

In contrast, Cain has objected to the settlement's DHIC provisions (and to collusion). [Doc. 174]. The DHIC purportedly "confers a benefit on all Settlement Class members." [Doc. 179, at Page ID#: 8609]. Thus, all members of the Class – not just those participating in the settlement – have an interest in the DHIC distribution. Accordingly, even though Cain did not submit a claim form by the deadline, he may still benefit from the DHIC distribution and has standing to object to those provisions if he has established that he is a member of the Settlement Class. Because there has been no dispute that Cain established this when he initially objected, he has standing to appeal. [Doc. 174]. *See, e.g., Dremak v. Iovate Health Scis. Grp., Inc.*, 2013 U.S. Dist. LEXIS 193760, at *179-81 (S.D. Cal. Nov. 12, 2013).

## B. Consideration of Relevant Factors for Determining the Propriety of an Appeal Bond Weigh Against Imposition of a Bond Here.

The parties urge the Court to consider various factors in determining if an appeal bond is appropriate, including "(1) the appellant's financial ability to post a bond; (2) the risk that the appellant would not pay appellee's costs if the appeal is unsuccessful, (3) the merits of the appeal, and (4) whether the appellant has shown any bad faith or vexatious conduct." [Doc. 195, at Page ID#: 8675]. The parties

incorrectly maintain that "[e]ach of these factors supports the bond requested here." [Doc. 195, at Page ID#: 8675]. However, rather than engaging in a meaningful analysis, the parties largely manipulate the analysis in order to unnecessarily disparage Cain. Thus, their analysis of the factors is mostly unhelpful and unnecessary. Nevertheless, a fair analysis reveals the punitive nature of the requested appeal bond.

***The parties have not demonstrated (nor can they) that Cain has the financial wherewithal to post a $561,489.44 bond.*** The parties first argue that objectors are presumed to have the financial ability to post a bond unless they demonstrate otherwise. [Doc. 195, at Page ID#: 8675]. Here, the parties argue that because Cain and Gallagher "have 'not presented any evidence demonstrating that they lack the financial ability to post a bond . . . , [then] the Objectors' ability to do so is presumed.'" [Doc. 195, at Page ID#: 8675]. Of course, Cain hasn't had an opportunity – until now – to even make such a showing. Nevertheless, the parties submit that Cain's mere status as a lawyer is sufficient. [Doc. 195, at Page ID#: 8676]. This, to say the least, is not persuasive.

Obviously, while an objecting class member should rightly expect imposition of a reasonable appeal bond, some common sense and logic must necessarily apply. Such a staggering amount – $561,489.44 – would naturally be beyond the means of most consumers to pay and would certainly tend to effectively discourage a meritorious appeal. This alone should undo any "presumption." Besides, the parties' motion has no plausible motive other than to compel Cain to altogether abandon his appeal.[6]

---

[6]As the court in *Vaughn v. Am. Honda Motor Co.*, 507 F.3d 295, 299 (5th Cir. 2007) observed, imposing too great a burden on an objector's right to appeal may discourage meritorious appeals or tend to insulate a district court's judgment in approving a class settlement from appellate review. 507 F.3d at 300.

***The parties have also failed to demonstrate a reasonable risk of nonpayment.*** Although

the parties argue that actions to collect costs after appeal would have to be instituted in two different states

[Doc. 195, at Page ID#: 8676], there is no evidence that Cain would not pay the reasonable costs on

appeal, as he has described here. Incredibly, on one hand, the parties say that Cain has the financial

wherewithal to pay a bond, and on the other, they claim he won't pay the costs on appeal. In the event

Cain is unsuccessful on appeal <u>and</u> fails to pay costs assessed against him, the parties would merely need

to institute a single collection action against him to recover such costs. So, it should not be assumed there

is a risk of non-payment.[7]

***Cain's appeal raises serious and legitimate issues concerning the fairness of the DHIC***

***component of the settlement and collusion.*** The parties argue that Cain's appeal lacks merit. [Doc.

195, at Page ID#: 8676]. They wrongly depict Cain's appeal as "frivolous on the merits" and characterize

his arguments as "recycled objections" that "present no novel issues for the Sixth Circuit." [Doc. 195, at

Page ID#: 8678]. The Court considered almost all of Cain's arguments[8] before granting final approval.

---

[7]To the extent the parties argue that Cain's alleged status as a purported "serial" objector
warrants an appeal bond, this point is without merit:

> the fact that the objectors are represented by counsel who specialize in
> objecting to class-action settlements is not a reason to think that they will
> shirk their liability for costs on appeal.

*In re Lawnmower Engine Horsepower Marketing & Sales Prac. Litig.*, 2010 U.S. Dist. LEXIS
123761, at *18 (E.D. Wisc. Nov. 2, 2010) (footnote omitted).

[8]As discussed in Cain's Opening Brief on appeal [Exhibit 2], the Court did not address or
otherwise consider his argument that the settlement granted Proctor & Gamble "sole discretion to select
the recipients." [Doc. 174, at Page ID#: 7351; Doc. 179, at Page ID#: 8613-15]. In addition, while
the Court overruled Cain's objection regarding collusion, it did so only with respect to Cain's argument
that the clear-sailing clause was a sign of collusion. In other words, the Court did not consider Cain's

[Doc. 179, at Page ID#: 8613-15]. Cain's arguments on appeal address the DHIC component of the settlement (and collusion). While the Court obviously disagreed with the issues Cain raised as well as his depiction of the DHIC as a *cy pres*, and it likely believes the arguments will not succeed on appeal, the efficacy of such settlement components has been questioned by Chief Justice John Roberts, who has stated that when a suitable case presents itself, the Supreme Court should consider "when, if ever, [*cy pres*] relief should be considered" and should "clarify the limits on the use of such remedies." *Marek v. Lane*, 134 S. Ct. 8, 9 (2013).

In view thereof, and for the reasons articulated in Cain's Opening Brief, Cain's arguments on appeal present substantive issues that may warrant additional consideration on appeal. *See Chiaverini*, 2008 U.S. Dist. LEXIS 45726, 2008 WL 2415340, at *2 (district court noting that although it disagrees with the plaintiff's claims on appeal, "the claims raised are viable and substantial issues").

Moreover, it is not the province of district courts to assess the strength of an appellant's appeal. Rather, "the Court of Appeals is the best forum to litigate the merits of the appeal and to account for any frivolity that harms the plaintiffs." *In re Am. Invs. Life Ins.*, 695 F. Supp. 2d 157, 166 (E.D. Pa. 2010); *Rossi v. Proctor & Gamble Co.*, No. 11-7238, 2014 U.S. Dist. LEXIS 34180, at *2 (D. N.J. March 17, 2014) ("Plaintiff cites no binding legal authority suggesting that a district court may step into the shoes of an appellate court to decide whether an appeal is frivolous . . . .").

---

actual objection, *i.e.*, that the clear-sailing clause **alone** gave the Court a duty of heightened scrutiny, and when combined with other signs of collusion identified by Cain, commanded rejected of the settlement. [Cain Objection, RE 174, at Page ID#: 7351-61].

***There is no evidence that Cain has engaged in bad faith or vexatious conduct in this case.***

The parties also urge the Court to consider whether Cain has shown bad faith or vexatious conduct. [Doc. 195, at Page ID#: 8679]. Specifically, the parties characterize Cain as a so-called "serial objector" who did not file his objection in "good faith." [Doc. 195, at Page ID#: 8673-74]. Of course, there is no actual evidence of any of this. It is pure conjecture.

That Cain may have represented objectors in the past is not indicia of bad faith or vexatious conduct anyway. *See In re Bayer Corp. Combination Aspirin Prods. Mktg. & Sales Practices Litig.*, 2013 U.S. Dist. LEXIS 125555 (E.D. N.Y. Sept. 3, 2013). And while the parties impute improper motive to Cain, all they really accomplish is demonstrating a fundamental misconception of the role played by objecting class members. After all, well-respected jurists[9] take a decidedly different view, acknowledging the importance of objecting class members in the final approval determination. Indeed, three of the leading class action cases of the last two decades – *Amchem, Ortiz,* and *Devlin*[10] – came after objectors litigated successfully to the Supreme Court. Significantly, the parties neither allege nor identify any specific actions by Cain that would seemingly equate to "bad faith or vexatious conduct" in this case.[11]

---

[9]*Redman v. Radioshack Corp.*, 768 F.3d 622, 629 (7th Cir. Ill. 2014).

[10]*Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 613 (1997), *Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 841-845 (1999), and *Devlin v. Scardelletti*, 536 U.S. 1 (2002).

[11]Significantly, the parties are not without recourse if an appeal is ultimately determined to be frivolous. For example, the amount of the bond set by the district court is also subject to review on appeal. *See, e.g., Azizian v. Federated Dep't Stores, Inc.*, 499 F.3d 950, 955 (9th Circ. 2007). Also, the parties may move to dismiss the appeal or move the Sixth Circuit to impose monetary sanctions, if the appeal is found to be frivolous. *See* Fed. R. App. P. 38; 28 U.S.C. § 1912.

In the final analysis, the parties cannot point to any direct evidence of dishonest purpose by Cain (much less his appellate counsel, who has not even entered an appearance in this Court). Rather, all they can say about Cain is that he has objected or represented others as objectors in the past. [Doc. 195, at Page ID#:8679]. Notably, there is a recognition that objectors make the system work better overall, and perhaps even make it more difficult for class counsel to overreach in a way that harms defendants.[12]

***Requiring an excessive appeal bond will have an undesirable effect of chilling meritorious appeals.*** Public policy concerns weigh heavily against imposition of such a staggering appeal bond on consumers. The Court should be mindful of the ramifications of an excessive bond. *See Page v. A. H. Robins Company*, 85 F.R.D. 139, 140 (E.D. Va. 1980)("Requiring too large a bond may have the undesirable effect of discouraging meritorious appeals"); *Clark v. Universal Builders, Inc.*, 501 F.2d 324, 341 (7th Cir. 1974) (stating that "any attempt by a court at preventing an appeal is unwarranted and cannot be tolerated"); *Lindsey v. Normet*, 405 U.S. 56, 77-79 (1972) (holding statute conditioning appeal on posting of double bond unconstitutional under Fourteenth Amendment equal protection clause). At a minimum, the staggering bond requested here would amount to an unfair "appeal tax" that will have a chilling effect on the ability of consumers to appeal the approval of class action settlements in the future.

---

[12]Wasserman, R., *Dueling Class Actions*, 80 B. U. L. Rev. 461, 483 (April 2000) (concluding that objectors are the only parties with an incentive to uncover flaws in the proposed settlement); Morrison, Alan B., *Improving the Class Action Settlement Process: Little Things Mean a Lot*, 79 Geo. Wash. L. Rev. 428 (Feb. 2011) ("objectors make the system work better overall, and perhaps even make it more difficult for class counsel to overreach in a way that harms defendants. Judges . . . increasingly realize that counsel for objectors can help them carry out their responsibilities.")

C.     The Court Should Require an Appeal Bond in the Amount of $1,000,
       Payable Jointly and Severally by the Appealing Objectors.

If the Court decides to require a bond, it then must decide the amount of the bond. Here, the

parties argue that the bond should include $1,000 in so-called "direct costs," stating that "these appeals will

entail significant recoverable costs." [Doc. 195, at Page ID#: 8682]. Plaintiff's counsel states that

"Plaintiffs' estimated costs on appeal for copying and binding the original and three copies of Plaintiffs-

Appellees' brief and appendix, and for copies of the court reporter's transcript of the final approval hearing

will total more than $1,000 for these two appeals." [Blood Decl., ¶9].

The parties make no real effort to justify the $1,000 in "direct costs." They certainly can't explain

how electronically filing and serving a single brief in the Sixth Circuit could conceivably cause them to incur

$1,000, when there is no appendix required. [6th Cir. R. 28(b)(1)(A)(I); 6 Cir. R. 30]. Moreover, a

recent cost study by the Federal Judicial Center[13] indicates that in this Circuit, average costs awarded under

Fed. R. App. P. 39(a)(2), where a judgment was affirmed, were just *$280.16*. *See Cobell v. Salazar*,

816 F. Supp. 2d 10, 16 (D. D.C. 2011) (court "agree[d] with [the objector appellant] that the plaintiff's

actual taxable costs pursuant to Fed. R. App. P. 39 w[ould] be closer to $200 than the $34,000 or so

asserted by the plaintiffs)."[14]

---

[13]The Federal Judicial Center's Study: *The Comparative Study of the Taxation of Costs in the Circuit Courts of Appeals Under Rule 39 of the Federal Rules of Appellate Procedure* (April 2011), provides statistics as to average cost awards. *See* Table 3 of the FJC Study (addressing costs awarded over a two-year period in the federal circuits). The study is available at: http://www.uscourts.gov/file/frap39reppdf.

[14]*See also Hill v. State St. Corp.*, 2015 U.S. Dist. LEXIS 50161 (D. Mass. Apr. 16, 2015) (including the sum of "$300 for taxable costs under Rule 39."); *Azizian*, 499 F.3d at 962 (vacating $40,000 of $42,000 initial bond order); *Vaughn*, 507 F.3d at 299-300 (Fifth Circuit reduced bond for

Notwithstanding the foregoing, Cain does not oppose an appeal bond in the amount of $1,000.

## D. The Court Should Deny the Parties' Motion to the Extent They Seek to Include Costs Not Enumerated in Rule 39.

The parties erroneously insist that incremental settlement administration costs ($71,500), interest ($429,589.44), and attorneys' fees ($58,400) should all be included in the bond. [Doc. 195, at Page ID#: 8682-87]. As demonstrated, in this case, such costs are not properly included in an appeal bond.

### 1. Incremental administration costs may not be included in the appeal bond because there is no underlying rule or statute that permits such costs to be shifted and the parties have not met their burden of properly estimating the costs.

The parties next argue that "incremental administrative costs" may be included in the bond. [Doc. 195, at Page ID#: 8683]. Their argument hinges on a misguided interpretation of *In re Cardizem*.[15] In *In re Cardizem*, the Sixth Circuit expressly adopted the reasoning of *Adsani v. Miller*, 139 F.3d 67, 71 (2d Cir. 1998) and *Pedraza v. United Guar. Corp.*, 313 F.3d 1323 (11th Cir. 2002) in interpreting "costs" under Fed. R. App. P. 7., quoting the Second Circuit, "where . . . [a] statute includes attorney's

---

brief production costs from $150,000 to $1,000); *Tennille*, 774 F.3d at 1257(Tenth Circuit reduced $25,000 bond to $5,000 bond to cover printing, copying, and record preparation costs); *In re Bayer*, 2013 U.S. Dist. LEXIS 125555, at *3 (reducing $25,000 bond, which appellees "failed to justify," to $5,000 for printing and copying record); *Curtis & Associates, P.C. v. Law Offices of David M. Bushman, Esq.*, 2011 U.S. Dist. LEXIS 23905, at *4-5 (E.D. N.Y. March 9, 2011) ($25,000 "plainly exceeds any reasonable expectation" of Rule 39 costs; $5,000 would be sufficient).

[15]In *In re Cardizem*, the Sixth Circuit did not address the issue of "delay costs" at all, focusing instead on the issue of whether attorney's fees could be considered "costs on appeal" for purposes of Rule 7.

fees 'as part of the costs' which may be taxed upon appeal, the district court may factor these fees into its

imposition of the bond for costs." *In re Cardizem*, 391 F.3d at 816. More recently, a district court within

the Eleventh Circuit, adhering to *Pedraza*, rejected the argument the parties raise here:

> The undersigned is persuaded that the better approach, in light of the
> holding in *Pedraza* and the lack of a fee shifting statute in the underlying
> case, is to limit the bondable costs on appeal to those enumerated in Rule
> 39(e).

*Muransky v. Godiva Chocolatier, Inc.*, 2016 U.S. Dist. LEXIS 175906, at *7 (S.D. Fla. Dec. 19,

2016). This approach, consistent with *Adsani*, *Pedraza* and *In re Cardizem*, also finds support in other

district court decisions addressing the issue.[16]

Here, the parties fail to identify any rule or statute that allows them to recover, as costs on appeal,

administrative funds spent maintaining the settlement pending this appeal. Although plenty of courts have

imposed bonds covering increased administrative costs, there is no "applicable fee-shifting statute" that

might justify imposition of the additional amount of bond in the present case. Instead, the parties argue that

the case involved consumer protection statute fee-shifting provisions "from California, Illinois, Florida,

---

[16]*See In re Initial Public Offering Securities Litig.*, 728 F. Supp. 2d 289, 292 (S.D. N.Y., Jul. 20, 2010) (damages resulting in delay of settlement administration and attorneys' fees may be included in a Rule 7 bond when there is a substantive statute in the underlying litigation which includes a fee-shifting provision that allows such costs to be awarded to the prevailing party); *In re Air Cargo Shipping Servs. Antitrust Litig.*, 2010 WL 1049269 at *2 (E.D. N.Y., Mar. 22, 2010) (damages resulting from delay or disruption of settlement administration caused by frivolous appeal may be appropriate where the relevant underlying statute provides for awarding costs incident to delay on appeal); *In re Toyota Motor Corp. Unintended Acceleration Marketing, Sales Practices, and Products Liability Litig.*, 2013 WL 5775118 (C.D. Cal., Oct. 21, 2013) (costs covering increased settlement administration not covered by Rule 7 unless they are within the scope of an applicable fee-shifting statute); *In re Bayer Corp. Combination Aspirin Products Mktg. & Sales Practices Litig.*, 2013 WL 4735641 (E.D. N.Y., Sep. 3, 2013) (administrative costs caused by delay should not be included in bond where no underlying statute authorizes them).

North Carolina, and New Hampshire." [Doc. 195, at Page ID#: 8686]. But Cain is a Class member from Tennessee, not any of those states, and the only claim alleged in the operative Complaint that applied to him and Class members from the other forty-six jurisdictions is a common law breach of warranty claim. [Doc. 165, at Page ID#: 6819].

No circuit court of appeals to entertain this issue has permitted a Rule 7 bond to include incremental administration costs, interest and attorneys' fees absent an underlying rule or statute permitting such costs under the facts presented. *See Tennille v. Western Union Co.*, 774 F.3d 1249, 1256 (10th Cir. 2014).

It appears the parties advocate a broader definition of "costs on appeal," pointing to the fact that the imposition of an appeal bond is left to the Court's discretion. However, Rule 7 expressly limits the bond to covering "costs on appeal." *Tennille*, at 1256. As explained above, circuit courts have unanimously limited that phrase to include only costs authorized by rule or statute. And so, this Court must reject the argument that it – or any court – has discretion to include in an appeal bond any cost an appellee might incur in defending an appeal. *See id.* (citing *In re Am. President Lines, Inc.*, 779 F.2d at 716-17 (D.C. Cir.) (rejecting argument that district court's inherent discretion supported imposing a Rule 7 appeal bond that covered appeal costs other than those set forth in Rule 39).

Moreover, the parties have failed to present a reasonable estimate of actual "incremental administration costs." *In re Countrywide*, 2010 U.S. Dist. LEXIS 131775, at *17. Specifically, "[t]he claim administrator estimates the costs incurred during this 13-month period will be about $5,500 per month." [Doc. 195, at Page ID#: 8683] (citing Hack Decl. ¶11). This number, extrapolated out to 13 months, equals $71,500. [Doc. 195, at Page ID#: 8683] (citing Hack Decl. ¶11). To support inclusion of additional administrative costs in the appeal bond, the parties have submitted a declaration of Mr. Jacob

Hack, a project manager at KCC. [Doc. 195-12, Hack Decl., at Page ID#: 9125]. Mr. Hack's estimate covers a variety of administrative tasks. [Hack Decl. ¶ 11]. Significantly, however, Mr. Hack fails to identify the estimated monthly amount for each of those tasks; nor does he confirm or otherwise reveal the total amount of such costs to date, monthly or otherwise), notwithstanding the fact that the best barometer of "increased administrative costs" would logically be costs actually incurred for anticipated tasks to date.

In the last analysis, the anticipated increased costs listed by Mr. Hack lack specificity and are speculative, at best.

> **2.** ***In re Cardizem*** **prohibits "lost interest" from being included in the appeal bond amount in this case absent a rule or statute permitting them to be construed as costs under Fed. R. App. P. 7.**

Next, the parties contend the Court should tack-on another $429,589.44 to cover "lost interest" because "these appeals deprive the Claimants, Class Representatives, and Plaintiffs' Counsel of interest that would otherwise accrue." [Doc. 195, at Page ID#: 8684]. For authority, they cite 28 U.S.C. § 1961 for the proposition that "district courts are required to award post judgment interest." [Doc. 195, at Page ID#: 8684]). But the parties cite no precedent in this circuit providing that such "lost interest" is available to be taxed against Cain under Rule 7 or any other rule or statute. Nor does any rule or statute – as demonstrated above – permit incremental administration costs, "lost interest" or attorneys' fees to be included in the requested appeal bond. Therefore, inclusion of such an amount would directly conflict with the Sixth Circuit's decision in *In re Cardizem*, supra.

What the parties appear to be advocating is an appeal bond that includes damages due to the delay the merits appeals might cause. But that is not the purpose of a Rule 7 bond. And while an estimate of

-17-

interest might be permitted in a supercedeas bond under Rule 8, the issue of a supercedeas bond under Rule 8 is not before the Court. Besides, there is no need for a Rule 8 supercedeas bond in this case, as the parties have voluntarily chosen, by the terms of the settlement, to delay execution pending an appeal. Thus, any delay costs associated with an appeal is not Cain's fault at all and cannot be billed to him.[17]

> **3.** ***In re Cardizem* prohibits prospective attorneys' fees on appeal from being included in the requested appeal bond because there is no underlying fee-shifting rule or statute which permits their inclusion as costs under Rule 7.**

The parties also seek to include $58,400 in estimated attorneys' fees as part of the appeal bond, citing *In re Cardizem*, 391 F.3d at 817-18. However, as discussed above, the district court must look to the underlying statutes involved in the litigation to determine if attorney's fees may be included as "costs." *See In re Countrywide*, 2010 U.S. Dist. LEXIS 131775, at *16-17 (citing *In re Cardizem*, 391 F.3d at 817). But the parties may not use consumer protection statute fee-shifting provisions "from California, Illinois, Florida, North Carolina, and New Hampshire" [Doc. 195, at Page ID#: 8686] to force Cain – a Tennessee Class member – to put up a bond including projected attorneys' fees.

In *In re Cardizem*, the Sixth Circuit rejected the approach by the district court, which had noted that all of the various state and federal statutes asserted by the plaintiffs could be considered in determining what sums were properly awardable in a bond. 391 F.3d at 817. Instead, the Sixth Circuit held that only the statute underlying the objector's claim in the action may be examined in assessing whether fees are properly awardable. *Id.*

---

[17]Notably, at least one court of appeals has held it reversible error to impose a supercedeas bond under Rule 8 ostensibly under the authority of a Rule 7 cost bond. *Eg., Vaughn v. Am. Honda Motor Co.*, 507 F.3d 295, 295-99 (5th Cir. 2007).

Although the parties cannot rely upon a substantive statute underlying the claims at issue to boost the amount of an appeal bond, they do incorrectly maintain that Cain's arguments on appeal are in bad faith and that projected fees may be included in the bond for that alternate reason. [Doc. 195, at Page ID#: 8686]. This Court is well aware of Cain's arguments as to the settlement. There is no doubt that the parties and the Court disagreed with those arguments. The part of the Court's decision that addressed Cain's arguments, however, did not even imply that Cain's objections were "frivolous." Rather, the Court variously characterized its rejection of Cain's objections as "failing on the merits " [Doc. 179, at Page ID#: 8613], "not availing [*Id.*], "fails" [Doc. 179, at Page ID#: 8614], and as "not well-taken" [*Id.*].

The standard "in bad faith or for purposes of harassment" requires the Court to find that the objecting parties filed their appeals either with subjective bad faith, or they "filed an action that was frivolous, unreasonable, or without foundation." *In re Countrywide*, at \*24-25 (quoting *Smith v. HM Wallace, Inc.*, 2009 U.S. Dist. LEXIS 91696, at \*2 (S.D. Fla. Oct. 1, 2009)). "Bad faith is 'not simply bad judgment or negligence, but implies the conscious doing of a wrong because of a dishonest purpose or moral obliquity; . . . it contemplates a state of mind affirmatively operating with furtive design or ill will.'" *Shah v. Collecto, Inc.*, 2005 U.S. Dist. LEXIS 19938, at \*14 (D. Md. Sept. 12, 2005).

For all of this, the Court cannot rightly conclude that Cain's conduct rises to this level, or that the Sixth Circuit will necessarily determine that Cain filed his appeal in bad faith. After all, despite the parties' vitriol directed at Cain, there is no direct evidence of ill will or dishonest purpose. Nor is there is an obvious indication that Cain should know his arguments are frivolous. While the Court may disagree with Cain's arguments, the purpose of the appeals process is to permit objectors to challenge such rulings. Accordingly, this matter is best left to the discretion of the Sixth Circuit.

In addition, although Class Counsel estimates they will incur $58,400 in lodestar opposing the objectors' appeals, it would appear this number is pure speculation, especially since it is one attorney's guess about the work another attorney and a paralegal might do in the appeal. [Doc. 195, at Page ID#: 8687] (citing Blood Decl., ¶14).

### 4. There is no precedent to warrant inclusion of "double costs" the Sixth Circuit may award in the appeal bond.

The parties suggest the Court should also double the cost award of $1,000 because the Sixth Circuit might find the appeal frivolous and award "just damages and single or double costs to the appellee" under Fed. R. App. P. 38. [Doc. 195, at Page ID#: 8687-88]. They argue that although it is up to the Sixth Circuit to make such a determination, "this Court has the authority to require a bond reflecting the Sixth Circuit's likely finding that the appeals are frivolous." [Doc. 195, at Page ID#: 8687-88].

For the reasons discussed above, the issue of awarding double costs on appeal against an appellant is best left to the Sixth Circuit after the conclusion of the appeal. This Court cannot rightfully predict how the Sixth Circuit will view the arguments asserted by Cain on appeal and the parties have not cited to a single decision by this Circuit or any other that permits a district court to forecast an award of double cost on appeal against a class action objector.

### IV. CONCLUSION

In conclusion, the appeal bond requested by the parties is plainly excessive. For all of the foregoing reasons, the Court should limit any appeal bond to $1,000, payable jointly and severally by the appealing objectors.

Respectfully submitted, this 6th day of September, 2018.


Christopher T. Cain, Pro se
SCOTT & CAIN
Suite 601
550 Main Street
Knoxville, TN  37902
Tel: (865) 525-2150

**CERTIFICATE OF SERVICE**

I hereby certify that on September 6, 2018 the foregoing was submitted by hand delivery to the Clerk of the United States District Court for the Southern District of Ohio. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Once the Clerk has received and posted it, the parties may access this filing through the Court's electronic filing system.

Christopher T. Cain

# EXHIBIT 1

Rikos v. The Procter & Gamble Company
Settlement Administrator
c/o KCC LLC
P.O. Box 404041
Louisville, KY 40233-4041

**PGK**



*RIKOS V. THE PROCTER
& GAMBLE COMPANY*

UNITED STATES DISTRICT COURT,
SOUTHERN DISTRICT OF OHIO

Case No.: 1:11-cv-00226

**Must Be Postmarked
No Later Than
May 16, 2018**

# Settlement Claim Form

## CLAIMANT INFORMATION

| First Name | M.I. | Last Name |
|---|---|---|
| C H R I S T O P H E R | T | C A I N |

Primary Address: 7 6 0 8 Q U E E N S B U R Y D R I V E

Primary Address Continued:

City: K N O X V I L L E

State: T N

Zip Code: 3 7 9 1 9

Foreign Province:

Foreign Postal Code:

Foreign Country Name/Abbreviation:

**Have you purchased and used Align® probiotic supplements, but received no digestive relief or other digestive benefit?
If so, you may be entitled to a refund as part of a class action settlement.**

To be eligible to receive a cash refund from the class action settlement, you **must** complete and return this Claim Form postmarked no later tha May 16, 2018. You may also submit your Claim Form online, no later than May 16, 2018, at www.AlignSettlement.com.

**1. Complete the Information Below.**

Number of packages of Align® purchased from March 1, 2009 through October 31, 2009 (may claim up to two packages)

[Below is an example of packaging available from March 1, 2009 through October 31, 2009]





| FOR CLAIMS PROCESSING ONLY | OB | | CB | | ○ DOC ○ LC ○ REV | ○ RED ○ A ○ B |
|---|---|---|---|---|---|---|

1

Number of packages of Align® purchased from November 1, 2009 through June 6, 2016 (may claim one package) [ ▾ ]

[Below are examples of packaging available from November 1, 2009 through June 6, 2016]

  

**2. Sign the Claim Form.** I declare under penalty of perjury that the information I have provided is true and correct.

Signature: _____     Dated: _9_/_28_|_19___

**Please submit the Claim Form online at www.AlignSettlement.com or return the Claim Form by mail to:**

Rikos v. The Procter & Gamble Company Settlement Administrator
c/o KCC LLC
P.O. Box 404041
Louisville, KY 40233-4041



CAIN
7400's Queensbry D-
Knoxville TN 37918

Rikos v. The Procter & Gamble Company Settlement Administrator
c/o KCC LLC
P.O. Box 46704 1
Louisville, KY 40233-4041

# EXHIBIT 2

NO. 18-3512

_____

# In the United States Court of Appeals For the Sixth Circuit

CHRISTOPHER TODD CAIN,
Appellant,

v.

DINO RIKOS; TRACEY BURNS; LEO JARZEMBROWSKI, On Behalf of
Themselves, All Others Similarly Situated and the General Public,
Plaintiffs–Appellees,

and

PROCTER & GAMBLE COMPANY,

Defendant–Appellee.

_____

**On Appeal from the United States District Court
for the Southern District of Ohio, No. 1-CV-00226-TSB**

_____

**OPENING BRIEF OF APPELLANT CHRISTOPHER TODD CAIN**

W. Allen McDonald, Esq.
LACY, PRICE & WAGNER, P.C.
249 N. Peters Road, Suite 101
Knoxville, TN 37923
Telephone: (865) 246-0800

*Counsel for Appellant*

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

TABLE OF CITATIONS. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . v

STATEMENT OF REASONS FOR ORAL ARGUMENT. . . . . . . . . . . . . . . . . xii

STATEMENT OF JURISDICTION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

I.      STATEMENT OF ISSUES. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

II.     PRELIMINARY STATEMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

III.    STATEMENT OF THE CASE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        A.      Course of Proceedings. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

        B.      Relevant Facts. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13

        C.      Rulings Presented for Review. . . . . . . . . . . . . . . . . . . . . . . . . . . . 18

IV.     STANDARDS OF REVIEW. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

V.      SUMMARY OF ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20

VI.     LEGAL ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 22

        A.      Whether the District Court abused its discretion by approving a
                settlement that (1) allocates up to $10 million in putative in-kind
                (*cy pres*) settlement benefits to unknown, undisclosed and
                uninjured third-parties when absent Class members are
                compensated for only half their losses, (2) conceals the identity
                of such third-parties from absent Class members, depriving absent
                Class members of an opportunity to assess the fairness or
                reasonableness of *cy pres* recipients and awards, and (3) grants
                P&G "sole discretion" to designate such recipients and awards. . . . 22

1. Digestive Health Improvement Contributions ("DHIC") – a negotiated term of the settlement agreement – is a cy pres remedy subject to fairness and adequacy considerations. . . . . . . . . . . . . . . . . . . . . . . . . 24

2. The settlement is unfair, inadequate and unreasonable because it allocates up to $10 million in in-kind cy pres benefits to an unknown number of undisclosed and uninjured third-parties even though absent Class members are just partly compensated for their losses . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 28

3. The settlement is unfair, inadequate and unreasonable because it conceals the identity of prospective cy pres recipients from absent Class members and also deprived absent Class members of any opportunity to assess the fairness or reasonableness of those recipients and/or awards... . . . . . . . . . 37

4. The settlement is unfair, inadequate and unreasonable because Class Counsel improvidently granted P&G "sole discretion" to designate all cy pres recipients and awards. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

B. The District Court Abused its Discretion by Failing to Apply a Heightened Level of Scrutiny to the Settlement Terms to Uncover Collusion Because the Settlement Agreement Is Rife with Multiple Signs of Collusion. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

1. The Undisputed Presence of a Clear-Sailing Agreement Required the District Court to Use Heightened Scrutiny in Reviewing the Settlement. . . . . . . . . 45

2. The District Court failed to inquire into Class Counsel's negotiations of the clear-sailing agreement to discover the price absent Class members had to pay for that agreement. . . . . . . . . . . . . . . . . . 49

3.  The controversial cy pres component is significantly
undermined by numerous signs of collusion and/or
conflicts that the District Court ignored.................. 50

VII.  CONCLUSION................................................ 54

CERTIFICATE OF COMPLIANCE WITH RULE 32(a). .................. 55

CERTIFICATE OF SERVICE. ....................................... 56

DESIGNATIONS OF RELEVANT DISTRICT COURT DOCUMENTS. ...... 57

# TABLE OF AUTHORITIES

## CASES

*Amchem Prods. v. Windsor*,
521 U.S. 591 (1997). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*In Baby Products Antitrust Litig.*,
708 F.3d 163 (3d Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . 22,29,32,35,42,43,52

*In re BankAmerica Corp. Sec. Litig.*,
775 F.3d 1060 (8th Cir. 2015).. . . . . . . . . . . . . . . . . . . . . . . . . . . 31,36,42,43,51

*In re Bluetooth Headset Prods. Liab. Litig.*,
654 F.3d 935 (9th Cir. 2011).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 48

*Caplin & Drysdale, Chartered v. United States*,
491 U.S. 617 (1989). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 34

*Custom LEC v. eBay, Inc.*,
2013 U.S. Dist. LEXIS 122022 (N.D. Cal. Aug. 27, 2013). . . . . . . . . . . . . . . . . 40

*Dennis v. Kellogg Co.*,
697 F.3d 858 (9th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32,40,41,42

*In re Diet Drugs Prods. Liab. Litig.*,
385 F.3d 386 (3rd Cir. 2004).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Gascho v. Global Fitness Holdings, LLC*,
822 F.3d 269 (6th Cir. 2016).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8,48,50

*Gooch v. Life Investors Ins. Co. of Am.*,
672 F.3d 402 (6th Cir. 2012).. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 7,46,48

*Government Employees Hosp. Ass'n v. Serono Intern., S.A.*,
246 F.R.D. 93 (D. Mass. 2007). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Greenberg v. Procter & Gamble Co. (In re Dry Max Pampers Litig.)*,
724 F.3d 713 (6th Cir. 2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,47

*Harris  v. Quinn*,
134 S. Ct. 2618, 2644 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Jackson v. Phillips*,
96 Mass. 539 (1867). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24

*In re Katrina Canal Breaches Litig.*,
628 F.3d 185 (5th Cir. 2010). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 40

*Klier v. Elf Atochem N. Am., Inc.*,
658 F.3d 468 (5th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . 3,24,27,34,35,36,51

*Knuckles v. Mary Jane Elliott, PC*,
2016 U.S. Dist. LEXIS 94858 (E.D. Mich. July 20, 2016). . . . . . . . . . . . . . 23,33

*Lane v. Facebook*,
696 F.3d 811 (9th Cir. 2012). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,27

*In re Lucent Technologies, Inc. Sec. Litig.*,
307 F. Supp. 2d 633 (D. N.J. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33,34

*In re Lupron Mktg. & Sales Practices Litig.*,
677 F.3d 21 (1st Cir.), cert. denied, 568 U.S. 932 (2012). . . . . . . . . . . . . . . . 34,53

*Malchman v. Davis*,
761 F.2d 893 (2d Cir. 1985), *abrogated on other grounds by
Amchem Products, Inc. v. Windsor*, 521 U.S. 591 (1997). . . . . . . . . . . . . . . . . 49

*Marek  v. Lane*,
571 U.S. 1003 (2013). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26,28,51

*In re Matzo Food Products Litig.*,
156 F.R.D. 600 (D.N.J.1994). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 29

*In re Microsoft Corp. Antitrust Litig.*,
185 F. Supp. 2d 519 (D. Md. 2002). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 26

*Mirfasihi v. Fleet Mortgage Corp.*,
356 F.3d 781 (7th Cir. 2004). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 31,51

*Mullane v. Central Hanover Bank*,
339 U.S. 306 (1950). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38,39

*Nachshin v. AOL*,
663 F.3d 1034 (9th Cir. 2011). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23,32,33

*New York State Teachers' Ret. Sys. v. GM Co.*,
315 F.R.D. 226 (E.D. Mich. 2016). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

*Ortiz  v. Fibreboard Corp.*,
527 U.S. 815 (1999). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

*Pearson v. NBTY, Inc.*,
772 F.3d 778 (7th Cir. 2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Phillips Petroleum Co. v. Shutts*,
472 U.S. 797 (1985). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

*Redman v. Radioshack Corp.*, 768 F.3d 622 (7th Cir. 2014),
*cert. denied sub nom. Nicaj v. Shoe Carnival, Inc.*, 135 S. Ct. 1429 (2015). . . . . 49

*In re Relafen Antitrust Litig.*,
231 F.R.D. 52 (D. Mass. 2005). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*SEC v. Bear, Stearns & Co., Inc.*,
626 F. Supp. 2d 402 (S.D. N.Y. 2009). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Six Mexican Workers v. Arizona Citrus Growers*,
904 F.2d 1301 (9th Cir. 1990). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33,38

*In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*,
869 F.3d 551 (7th Cir. 2017)............................................. 36

*Surles ex rel. Johnson v. Greyhound Lines, Inc.*,
474 F.3d 288 (6th Cir. 2007)............................................. 20

*In re Tyco Intern. Ltd. Multidistrict Litig.*,
535 F. Supp.2d 249 (D. N. H. 2007)...................................... 34

*Vassalle v. Midland Funding LLC*,
708 F.3d 747 (6th Cir. 2013)............................................. 19

*In re Veritas Software Corp. Secs. Litig.*,
496 F.3d 962 (9th Cir. 2007)............................................. 39

*Weinberger v. Great N. Nekoosa Corp.*,
925 F.2d 518 (1st Cir. 1991)............................................. 49

*In re Whirlpool Corp. Front-Loading Washer Prods. Liab. Litig.*,
2016 U.S. Dist. LEXIS 130467, at *58-61 (N.D. Ohio Sept. 23, 2016). ....... 45

## RULES & STATUTES

28 U.S.C. § 1291. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Class Action Fairness Act of 2005, 28 U.S.C. § 1332(d). . . . . . . . . . . . . . . . . 1,10

28 U.S.C. § 1404(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. App. P. 4(a)(3). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

Fed. R. App. P. 32(a)(5). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fed. R. App. P. 32(a)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fed. R. App. P. 32(a)(7)(B). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fed. R. App. P. 32(a)(7)(B)(iii). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 55

Fed. R. App. P. 34(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

Fed. R. Civ. P. 8(a). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 9(b). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 12(b)(1). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 12(b)(6). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10

Fed. R. Civ. P. 23. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 20,33,34,36,39,44,45

Fed. R. Civ. P. 23(a)(4). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 45

Fed. R. Civ. P. 23(e). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

Fed. R. Civ. P. 23(e)(1)(c). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 19

Fed. R. Civ. P. 23(e)(2). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 46

Fed. R. Civ. P. 23(f)............................................. 11

Fed. R. Civ. P. 23(g)(4).......................................... 46

Sixth Circuit Rules 28............................................ 55

Sixth Circuit Rules 32............................................ 55

## SECONDARY AUTHORITIES

*American Law Institute's Principles of the Law of*
*Aggregate Litigation* (2010)........................... 30,31,34,35,36,51

Christine P. Bartholomew, *Saving Charitable Settlements*,
83 Fordham L. Rev. 3241 (2015)............................... 25,26,29

Jennifer Johnston, *Comment, Cy Pres Comme Possible to Anything is Possible:*
*How Cy Pres Creates Improper Incentives in Class Action Settlements*,
9 J.L. Econ. & Pol'y 277 (2013)..................................... 25

Herbert Newberg & Alba Conte, *Newberg on Class Actions* (4th ed. 2002).. 39,51

*Note: Class Action Settlements, Cy Pres Awards, and the Erie Doctrine*,
111 Nw. U.L. Rev. 1097 (2017)...................................... 25

Martin H. Redish, et al., *Cy Pres Relief and the Pathologies of the*
*Modern Class Action: A Normative and Empirical Analysis*,
62 Fla. L. Rev. 617 (2010)...................................... 24,25

Barbara J. Rothstein & Thomas E. Willging, *Fed. Judicial Ctr.*,
*Managing Class Action Litigation: A Pocket Guide for Judges*
17 (3d ed. 2010)..................................................... 51

William B. Rubenstein, *Newberg on Class Actions* (5th ed.)............... 3,32

Cecily C. Shiel, *Note, A New Generation of Class Action Cy Pres Remedies:*
*Lessons from Washington State*, 90 Wash. L. Rev. 943 (2015)............... 25

Rhonda Wasserman, *Cy Pres in Class Action Settlements*,
88 S. Cal. L. Rev. 97 (2014). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27

7B Charles Alan Wright et al., *Federal Practice and Procedure*,
§ 1787  (2d ed. 1986). . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 39

## STATEMENT OF REASONS FOR ORAL ARGUMENT

Oral argument is requested pursuant to Fed. R. Fed. P. 34(a).  In this appeal, the Court is asked to resolve important issues of first impression regarding the approval of a class action settlement, including (1) whether the United States District Court for the Southern District of Ohio ("District Court") abused its discretion by granting final approval of the settlement notwithstanding a *cy pres* component whereby Proctor & Gamble ("P&G") may select, in its sole discretion, an unknown number of undisclosed and uninjured third-parties and award them "in-kind" settlement benefits of up to $10 million, although not a single absent Class member would receive more than half of their losses; and (2) whether the District Court abused its discretion by failing to apply heightened scrutiny to settlement terms despite palpable signs of collusion.

Oral argument will be beneficial to facilitate the Court's understanding of the issues.

## STATEMENT OF JURISDICTION

*Subject Matter Jurisdiction of District Court.* The District Court had diversity jurisdiction under the Class Action Fairness Act of 2005 ("CAFA"), 28 U.S.C. § 1332(d), as the matter in controversy, exclusive of interest and costs, exceeds the sum or value of $5 million and is a class action in which members of the class of plaintiffs are citizens of states different from P&G. Further, greater than two-thirds of absent Class members reside in states other than the state in which P&G is a citizen. [Third Am. Compl., RE 165, Page ID#: 6797].

*Subject Matter Jurisdiction of Appellate Court.* This Court has jurisdiction of this appeal under 28 U.S.C. § 1291, as it arises from the April 30, 2018 final order [Final Order, RE 179, at Page ID#: 8585-8620] and judgment disposing of all claims. [Judgment, RE 180, Page ID#: 8621]. On May 30, 2018, Appellant Christopher T. Cain timely filed a notice of appeal from the Judgment under Fed. R. App. P. 4(a)(3). [Notice of Appeal, RE 185, at Page ID: 8633-34].

## I.   STATEMENT OF ISSUES

A.   Whether the District Court abused its discretion by approving a settlement that (1) allocates up to $10 million in putative in-kind settlement benefits to unknown, undisclosed and uninjured third-parties when absent Class members are compensated for only half their losses, (2) conceals the identity of such third-parties from absent Class members, depriving absent Class members of an opportunity to assess the fairness or reasonableness of *cy pres* recipients and awards, and (3) grants P&G "sole discretion" to designate such recipients and awards.

B.   Whether the District Court abused its discretion by failing to apply a heightened level of scrutiny to the settlement terms to uncover collusion because the settlement agreement is rife with multiple signs of collusion.

## II.    PRELIMINARY STATEMENT

> *Settlement proceeds, "having been generated by the value*
> *of the class members' claims, belong solely to the class*
> *members."*[1]

Class actions play a vital role in the judicial system. Often, they are the only way plaintiffs can be compensated and defendants held to account for serious misdeeds with widely diffuse harms. *Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997). But class action settlements also create special problems. *See, e.g., Ortiz v. Fibreboard Corp.*, 527 U.S. 815, 852 (1999). For instance, parties often structure class action settlements to hide economic reality, create the appearance of a larger recovery, and thus support a larger claim for attorneys' fees. This case involves one controversial device often used to create the mere "illusion of compensation," a so-called *cy pres* recovery.[2]

Class member Christopher T. Cain ("Cain") objected to the settlement proposed by the parties, arguing that a component of the settlement the parties valued at between $5 million and $10 million is unfair, inadequate and unreasonable. Specifically, in addition to cash refunds which would no more than half-compensate

---

[1]*Klier v. Elf Atochem N. Am., Inc.*, 658 F.3d 468, 474 (5th Cir. 2011).

[2]*Cy pres* comes from the French expression cy pres comme possible, which means "as near as possible." William B. Rubenstein, *Newberg on Class Actions,* § 12.32 (5th ed.).

absent Class members for their injuries and losses, the parties agreed to allow P&G to divert up to $10 million worth of "in-kind" settlement benefits to an unknown number of unidentified and uninjured third-parties.

Not surprisingly, realizing the controversy involved with such awards, the parties have gone to extraordinary lengths to insure these distributions are not depicted as what they really are – *cy pres* awards. For example, they repeatedly refer to the distributions by using the moniker, Digestive Health Improvement Contributions ("DHIC"), and use phrases like "to benefit directly the Settlement Class,"[3] "directly benefit the Settlement Class,"[4] and "targeted to benefit directly the Settlement Class"[5] to describe its purported intent. Surprisingly, they were even able convince the District Court that the distributions were not actually *cy pres* awards.[6] Despite their efforts, the weight of authority – including cases and scholars alike – is against them: DHIC are *cy pres* awards and must be scrutinized as such.

Careful judicial scrutiny is necessary in class action settlements, lest class counsel and defendants bargain away the rights of absent class members on terms that

---

[3][Agreement, RE 166-2, at Page ID#: 6890].

[4] [Agreement, RE 166-2, at Page ID#: 6893].

[5][Agreement, RE 166-2, at Page ID#: 6944].

[6][Final Order, RE 179, at Page ID#: 8608] ("the DHIC is not a cy pres award)."

-4-

minimize payoff by the defendant, maximize benefit to class counsel, and frequently leave injured class members out in the cold. Here, the District Court accepted the parties' word and failed to engage in even minimal scrutiny of the *cy pres* distributions, much less the heightened scrutiny required.

*First*, the District Court abused its discretion by endorsing Class Counsel and P&G's diversion of up to $10 million worth of settlement benefits belonging to Class members – so-called Digestive Health Improvement Contributions ("DHIC") – to an unknown number of undisclosed and uninjured third-parties, notwithstanding the fact that Class members would receive compensation for only half of their losses (between $15.88 and $49.26 based upon the number and dates of purchase). This provision – created to mimic real and direct Class benefits – completely undermines the fairness, adequacy and unreasonableness of the overall settlement.

In this case, the *cy pres* provision approved by the District Court takes property from absent Class members, transforms it into monetary value, and gives it to undisclosed third-parties – without the meaningful consent of Class members who own those benefits. The awards also gave Class Counsel and P&G a tool with which they could further enrich themselves, cloaking themselves with a socially-acceptable veneer of philanthropy. Yet, it is philanthropy with someone else's property, obscuring the uglier reality that it comes through self-dealing and collusion.

In a very real sense, absent Class members – whose claims provide the only justification for the entire proceeding – are set to receive absolutely nothing from the *cy pres* distributions. Meanwhile, Class Counsel have used the claims to justify higher fees and P&G received a discounted cost of settlement and all litigation participants, except for the claims' owners, are praised for their role in generating extra-funding for non-profits or charities. Even society potentially receives some additional deterrence benefit, while absent Class members receive nothing.

For all of this, the real winners in this settlement – aside from the named Plaintiffs, Class Counsel and P&G – are the as-yet-unknown number of as-yet undisclosed and uninjured *cy pres* recipients, not absent Class members.

*Second*, the District Court abused its discretion by approving a settlement in which the settlement notice omitted material details regarding prospective *cy pres* awards. Specifically, the notice failed to identify a single prospective *cy pres* recipient, a vital piece of information necessary to both assess the fairness of the *cy pres* awards and object. What is more, the deficient notice also restricted the District Court's – and now this Court's – ability to conduct the requisite searching inquiry in order to approve such a large distribution of settlement benefits.

*Third*, the District Court also abused its discretion by approving a settlement in which Class Counsel inexplicably ceded to P&G complete discretion for both

selecting *cy pres* recipients and the form and combination of such awards. Remarkably, the District Court did not even address or otherwise consider Cain's objection that the settlement granted P&G "sole discretion to select the recipients."[7] Therefore, because the District Court disregarded fundamental deficiencies in the *cy pres* provisions and applied an overly permissive standard in approving that component, the Court should vacate the judgment and remand for further proceedings.

*Fourth*, the District Court abused its discretion by failing to apply heightened scrutiny to collusive settlement terms, including a clear-sailing clause by which P&G agreed not to object to Class Counsel's requested fee, and a fundamentally-flawed *cy pres* component that would take settlement benefits belonging to injured Class members and divert them to an unknown number of undisclosed and uninjured third-parties – without giving Class members a real opportunity to object to the distribution.

Importantly, this Court has directed district courts to be especially wary when, as here, class action parties agree not to contest fees. *Gooch v. Life Investors Ins. Co. of Am.*, 672 F.3d 402, 426 (6th Cir. 2012). The inclusion of such agreements gives

---

[7][Cain Objection, RE 174, at Page ID#: 7351; Final Order, Re 179, at Page ID#: 8613-15].

-7-

district courts "a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit to the class." *Gascho v. Global Fitness Holdings, LLC*, 822 F.3d 269, 291 (6th Cir. 2016). And so, facing such an agreement, the District Court had a duty to engage in heightened scrutiny to uncover further signs of collusion. Yet, it did none of this. If it had, it might have noticed or uncovered a number of red flags of collusion undermining approval of the settlement.

Moreover, while the District Court overruled Cain's objection regarding collusion, it did so only with respect to Cain's argument that the clear-sailing clause was a sign of collusion. It failed to consider Cain's actual objections, *i.e.*, that the clear-sailing agreement alone imposed a duty on the Court to give the settlement heightened scrutiny, and when combined with other signs of collusion, commanded the settlement's rejection.[8]

While this Court has noted that "absent more," a clear-sailing agreement does not demonstrate a district court abused its discretion in approving a settlement, *Gascho*, 822 F.3d at 292, that provision is only one of a number of red flags of collusion present here. For example, the mere existence of the clear-sailing agreement increases the likelihood that Class Counsel bargained away something of

---

[8][Cain Objection, RE 174, at Page ID#: 7351-61].

value that belonged to Cain and other absent Class members. Yet, the District Court made no effort to discover what Class Counsel may have bargained away for P&G's promise.

Class Counsel's betrayal of their clients is palpable. From structuring a settlement based on a settlement-value largely inflated to produce a $4.5 million fee, to failing to inform absent Class members of material settlement details – signs of collusion abound.

Worse still, the District Court abandoned its role as guardian of absent Class members by ignoring significant red flags. For example, in addition to the foregoing, it disregarded: that *cy pres* relief provided no direct benefit to absent Class members, that *cy pres* settlements exacerbate "the perennial risk of collusion" between the parties at the expense of absent class members, that *cy pres* relief creates the illusion of direct Class relief and distorts the value of settlements, and with it, inflates attorneys' fees, that defendants face particularly strong incentives to collude with class counsel and against the class when *cy pres* awards are in play, and lastly, that *cy pres* relief also creates a risk or appearance of self-dealing.

The Court should vacate the decision below and remand the case for more rigorous scrutiny of signs of collusion and *cy pres* relief.

## III.   STATEMENT OF THE CASE

### A.   Course of Proceedings

*District Court proceedings.*  Plaintiffs commenced this action on September 21, 2010 by filing a class action suit in the Southern District of California alleging violations of state consumer protection laws against The Proctor & Gamble Company ("P&G").  [Compl., RE 1, at Page ID#: 1-43].  The lawsuit – a diversity action under the Class Action Fairness Act, 28 U.S.C. § 1332(d) – challenged P&G's false, misleading or deceptive labeling and advertising of Align®, an over-the-counter "digestive care" product.  [Compl., RE 1, at Page ID#: 2-3].  Plaintiff amended his complaint on October 27, 2010.  [Am. Compl., RE 9, at Page ID: 62-84].

On November 22, 2010, P&G moved to dismiss the Amended Complaint under Fed. R. Civ. P. 12(b)(1), 12(b)(6), 9(b), and 8(a) [Motion to Dismiss, RE 10, at Page ID#: 103-05] and transfer venue to the Southern District of Ohio under to 28 U.S.C. § 1404(a) [Motion to Transfer, RE 11, at Page ID#: 139-140].  On April 13, 2011, the Southern District of California transferred the case to the Southern District of Ohio. [Order Granting Motion to Transfer Venue, RE 25, at Page ID#: 371-74].

On May 4, 2011, District Judge Timothy S. Black entered an order granting in part (with respect to injunctive relief) and denying in part (on all other grounds) P&G's motion to dismiss.  [Order on Motion to Dismiss, RE 28, at Page ID#: 385-

418]. P&G answered the amended complaint, denying liability, on June 8, 2011. [Answer, RE 54, at Page ID#: 502-23].

On August 14, 2012, the District Court granted Plaintiff leave to amend his complaint. [Order Granting Motion for Leave to File Second Amended Complaint, RE 84, at Page ID#: 949-59]. On August 17, 2012, Plaintiff filed his second amended complaint. [Second Am. Compl., RE 85, Page ID#: 960-89]. On September 4, 2012, P&G answered that complaint. [Answer, RE 86, Page ID#: 990-1019].

On November 30, 2012, P&G moved for partial judgment on the pleadings and to dismiss for lack of jurisdiction. [Motion for Partial Judgment on the Pleadings, RE 90, at Page ID#: 1035-37]. On January 30, 2013, the District Court granted this motion, in part. [Order on Motion for Partial Judgment on the Pleadings, RE 94, at Page ID#: 1102-1110].

On January 13, 2014, Plaintiff moved to certify a class. [Motion for Class Certification, RE 108, at Page ID#: 1192-1240]. On June 19, 2014, the District Court entered an order granting Plaintiff's motion to certify. [Order Granting Motion for Class Certification, RE 140, at Page ID#: 6415-6452].

P&G filed a petition for an interlocutory appeal under Rule 23(f) of the Federal Rules of Civil Procedure, which the Court granted on November 3, 2014. [Order Granting Appeal, RE 143, at Page ID#: 6649-51]. On August 20, 2015, this Court

affirmed the District Court's order granting class certification.  [Opinion and Judgment, RE 145, at Page ID#: 6657-6699].  On December 28, 2105, P&G filed a petition for writ of certiorari.  [Sup. Ct. Ltr., RE 147, at Page ID#: 6702].  The petition was denied on March 28, 2016.  [Notice, RE 148, at Page ID#: 6703].

On September 25, 2017, the parties reported they had executed a settlement agreement, would be filing a motion for approval with a week, and sought and received leave for Plaintiff to file an amended complaint.  [Sept. 25, 2017 Minute Entry].

On September 29, 2017, Plaintiffs filed a third amended complaint.  [Third Am. Compl., RE 165, at Page ID#: 6794-6822].  They also filed a motion for preliminary approval of the settlement.  [Motion for Preliminary Approval, RE 166, at Page ID#: 6823-68].  On December 20, 2017, the District Court granted preliminary approval, conditionally certified a settlement class, provided for notice and a fairness hearing. [Order Granting Preliminary Approval, RE 167, at Page ID#: 7042-51].

On March 2, 2018, Plaintiffs moved for final approval and attorneys' fees. [Motion for Final Approval, RE 170, at Page ID#: 7128-79].  Four objections were filed, including that of Christopher T. Cain.  [Gallagher Objection, RE 171, at Page ID#: 7328-33; Sweeney Objection, RE 173, at Page ID#: 7336-46; Cain Objection,

RE 174, at Page ID#: 7349-64; Brunet Objection, RE 175, at Page ID#: 7366-73].

Plaintiffs and P&G responded. [P&G Response, RE 176, at Page ID#: 7375-88;

Plaintiff's Response, RE 177, at Page ID#: 7408-39].

The District Court conducted a fairness hearing on April 16, 2018. On April

30, 2018, the District Court entered an order granting final approval and awarding

attorney's fees and expenses. [Final Order, RE 179, at Page ID#: 8585-8620;

Judgment, RE 180, at Page ID#: 8621].

*Appellate Proceedings.* Cain timely filed a notice of appeal on May 30, 2018.

[Notice of Appeal, RE 185, at Page ID: 8633-34]. The appeal was docketed in this

Court on May 31, 2018. [Appeal Doc. 1]. Objector Gallagher also appealed. [Notice

of Appeal, RE 186, at Page ID#: 8637-38]. Her appeal (Appeal No. 18-3521) remains

pending. [Appeal Doc. 29].

### B.   Relevant Facts

Plaintiffs' allegations against P&G concerned P&G's labeling and advertising

of Align®, an over-the-counter probiotic supplement. Align is promoted as helping

to build and maintain a healthy digestive system, restore natural digestive balance,

and protect against occasional digestive upsets. [Third Am. Compl., RE 165, at Page

ID#: 6795]. Plaintiffs alleged Align fails to deliver the advertised benefits. [*Id.* at

Page ID#: 6795-96].

The parties litigated the case for six and a half years before reaching a settlement in March 2017. [Final Order, RE 179, at Page ID#: 8586-87]. According to Class Counsel, "[t]he combined value of the Cash Refunds, DHIC payments, Notice and Claim Administration Expenses and Attorneys' Fees and Expenses is at least $20.3 million and may exceed $30 million." [Motion for Final Approval, RE 170, at Page ID#: 7157]. The settlement proposed the following terms:

First, Class members may receive a cash refund of up to $49.26 for three purchases of Align. [Agreement, RE 166-2, at Page ID#: 6894]. The cash refund amount purportedly represents 50% of Align's average retail price. [Motion for Final Approval, RE 170, at Page ID#: 7147]. P&G would pay out up to $15 million in cash refunds [Agreement, RE 166-2, at Page ID#: 6894-95], as follows:

> ■ Class members would be entitled to cash refunds for up to two (2) purchases of Align made between March 1, 2009 and October 31, 2009 (defined as the period when the marketing claims included "clinically proven" symptom relief claims). The amount of cash refund for each such purchase is $15.88, which is 50% of the average weighted retail price of Align during that time period.

> ■ Class members would be entitled to a cash refund for one (1) purchase of Align made between November 1, 2009 and June 6, 2016. The amount of cash refund for each such purchase is $17.50, which is 50% of the average weighted retail price of Align during that time period.

■ Each Class member would be limited to a maximum cash refund of $49.26 for three Align purchases based on the foregoing formula and each Class Member's respective, qualifying purchase(s) of Align.

[Agreement, RE 166-2, at Page ID#: 6894-95].

Second, in addition to cash refunds, P&G would also contribute a minimum of $5 million and up to $10 million worth of so-called "Digestive Health Improvement Contributions" ("DHIC"). [Agreement, RE 166-2, at Page ID#: 6893-94]. These contributions would "support digestive health research and education." [Agreement, RE 166-2, at Page ID#: 6893]. The parties stated that "[c]ontributions will directly benefit the Settlement Class by targeting U.S. consumers who suffer from Irritable Bowel Syndrome, or who regularly seek assistance and care for their digestive health." [Agreement, RE 166-2, at Page ID#: 6893-94; Motion for Final Approval, RE 170, at Page ID#: 7156].[9] Significantly, P&G would have *sole discretion to select the recipients, and form, of* the DHIC, subject to prior review and approval by Class Counsel. [*Id.*].[10]

_____

[9]The contributions would be in the form of: (1) "intellectual property and/or know-how"; (2) "research and/or education grant(s)"; and/or (3) "product donations to research and/or educational institutions and/or programs working to improve digestive heath." [Agreement, RE 166-2, at Page ID#: 6893-94].

[10]As for identifying prospective recipients, there is only this: "The Parties have already starting working on a worthy recipient of DHIC contributions." [Motion for Final Approval, RE 170, at Page ID#: 7169].

The Agreement provides that if eligible cash refund claims are below $10 million, P&G will contribute "Additional DHIC" so that the total aggregate contributions to the Class (including cash refunds and all DHIC) will reach $15 million. [Agreement, RE 166-2, at Page ID#: 6895]. The parties estimated that eligible cash refund claims would exceed $10 million. [Blood Decl., RE 170-1, at Page ID#: 7197]. If the aggregate amount of eligible claims exceeds $15 million, P&G will contribute additional DHIC up to a maximum of $25 million total value (including cash refunds and all DHIC) to the Class. [Agreement, RE 166-2, at Page ID#: 6896].

Third, the settlement provides "injunctive relief" by prohibiting P&G from making the "clinically proven" five symptom-relief claims contained on the Align packaging sold to consumers from approximately March 1, 2009 through October 31, 2009. [Agreement, RE 166-2, at Page ID#: 6897]. Fourth, P&G agreed to pay the Notice and Claim Administration Expenses. [Agreement, RE 166-2, at Page ID#: 6898]. Fifth, Class Counsel would apply for an award of Attorneys' Fees and Expenses not to exceed $4.5 million. [Agreement, RE 166-2, at Page ID#: 6906-07]. Significantly, P&G agreed not to oppose Class Counsel's fee and expense request.

[*Id.*].[11]

The District Court granted preliminary approval of the proposed settlement and

certified the following Class:

> All persons who purchased within the United States and its
> territories P&G's Align, other than solely for purposes of
> resale, from March 1, 2009 to June 6, 2016. Excluded from
> the Settlement Class are: (I) Defendant and its officers,
> directors, and employees; (ii) any person who files a valid
> and timely Request for Exclusion; and (iii) judicial officers
> and their immediate family members and associated court
> staff assigned to the case.

[Preliminary Approval Order, RE 167, at Page ID#: 7043].

The notice approved by the District Court apprized Class members of selected

settlement details. [Agreement, RE 166-2, at Page ID#: 6940-48]. Significantly, the

notice did not inform Class members of the identity of a single potential recipient of

so-called "DHIC." [Agreement, RE 166-2, at Page ID#: 6944].

Cain is a member of the Class, having purchased Align® within the United

States, other than solely for purposes of resale, from March 1, 2009 to June 6, 2016.

[Cain Objection, RE 174, at Page ID#: 7363]. He objected to the settlement on two

primary grounds:

---

[11]Class Counsel would also apply for service awards of $2,500 each for the
Class Representatives. [Agreement, RE 166-2, at Page ID#: 6907].

■ *first*, the DHIC is an unfair and unreasonable *cy pres* provision, (1) allocating up to $10 million in putative "direct" Class benefits to undisclosed and/or unknown non-Class recipients even though not a single absent Class member would receive more than half his losses, (2) inexplicably concealing the identity of recipients from Class members and thereby depriving them of any opportunity to assess the fairness or reasonableness of such awards, and (3) allowing P&G "sole discretion" to select such recipients [Cain Objection, RE 174, at Page ID#: 7352-59]; and

■ *second*, Cain submitted that the proposed settlement should be rejected because it is rife with indicia of collusion, including: (1) a negotiated clear-sailing clause, (2) nominal recoveries for Settlement Class members (between $15.88 and $49.26) who would, at most, receive just half of their out-of-pocket losses, and (3) inexplicably granting unfettered discretion to P&G to select recipients of so-called "DHIC" [Cain Objection, RE 174, at Page ID#: 7359-61].

## C.   Rulings Presented for Review

In a clear error, the District Court erroneously found the settlement to be "fair, reasonable and adequate." [Final Order, RE 179, at Page ID#: 8597-8600]. The District Court also overruled Cain's objections to the settlement. [Final Order, RE 179, at Page ID#: 8613-15].[12]   Specifically, the District Court rejected Cain's

---

[12]The District Court did not address or otherwise consider Cain's objection that the settlement granted P&G "sole discretion to select the recipients." [Cain Objection, RE 174, at Page ID#: 7351; Final Order, Re 179, at Page ID#: 8613-15]. In addition, while the District Court overruled Cain's objection regarding collusion, it did so only with respect to Cain's argument that the clear-sailing

objection that the DHIC is unfair because it provides benefits to non-Class members notwithstanding that Class members are compensated for merely half of their losses, finding that Cain failed to "cite to any authority" for that proposition. [Final Order, RE 179, at Page ID#: 8613-14].

The District Court also rejected Cain's objection that notice did not identify DHIC recipients, finding "there is no requirement that the ultimate recipients of the DHIC be disclosed prior to settlement approval." [Final Order, RE 179, at Page ID#: 8614-15].

Lastly, the District Court rejected Cain's objection regarding collusion and the "clear-sailing" clause, finding that the mere fact that P&G agreed to not contest Class Counsel's fee request is insufficient to demonstrate collusion. [Final Order, RE 179, at Page ID#: 8615].

## IV.   STANDARD OF REVIEW

Before a district court approves a settlement, the court must find that the settlement is "'fair, reasonable, and adequate.'" *Vassalle v. Midland Funding LLC*, 708 F.3d 747, 754 (6th Cir. 2013) (quoting Fed. R. Civ. P. 23(e)(1)(c)). The burden

---

clause was a sign of collusion. The District Court did not consider Cain's actual objection, *i.e.*, that the clear-sailing clause alone gave the Court a duty of heightened scrutiny, and when combined with other signs of collusion identified by Cain, commanded rejected of the settlement. [Cain Objection, RE 174, at Page ID#: 7351-61].

of proving the fairness of the settlement is on the proponents. *In re Dry Max Pampers Litig.*, 724 F.3d 713, 719 (6th Cir. 2013). This Court reviews the district court's approval of the settlement under an abuse-of-discretion standard. *In re Dry Max Pampers Litig.*, 724 F.3d at 717.[13]

## V.   SUMMARY OF ARGUMENT

Under Fed. R. Civ. Rule 23, the District Court had a duty to assess the fairness, adequacy and reasonableness of this class action settlement, including the settlement's *cy pres* provision.

*First*, the District Court abused its discretion by overruling Cain's objection in approving a fundamentally-flawed settlement, approving, with minimal scrutiny, controversial *cy pres* awards to an unknown number of undisclosed uninjured third-parties, even though absent Class members have been only partially compensated for their losses.

*Second*, Cain also objected to class notice, arguing that during the settlement process, the parties had insured that the identities of prospective third-party recipients of the *cy pres* awards were shielded from absent Class members via a constitutionally

---

[13]"An abuse of discretion occurs when the district court relies on clearly erroneous findings of fact, improperly applies the law, or employs an erroneous legal standard." *Surles ex rel. Johnson v. Greyhound Lines, Inc.*, 474 F.3d 288, 296 (6th Cir. 2007) (internal citation and alteration omitted).

defective notice, after which absent Class members had no meaningful opportunity to object to the recipients or awards. The District Court abused its discretion by concluding that this fundamentally deficient notice complied with due process.

*Third*, Class Counsel also made sure that absent Class members would have no input or role in selecting cy pres recipients by agreeing that P&G would have "sole discretion" in determining the recipients and amounts of every *cy pres* award. The District Court abused its discretion by completely ignoring this part of Cain's objection.

*Lastly*, the District Court abused its discretion by failing to engage in heightened scrutiny of the settlement, as required by law, ultimately approving the settlement notwithstanding multiple red flags of collusion that undermine the fairness, adequacy and reasonableness of the settlement.

## VI.   LEGAL ARGUMENT

**A.   Whether the District Court abused its discretion by approving a settlement that (1) allocates up to $10 million in putative in-kind (*cy pres*) settlement benefits to unknown, undisclosed and uninjured third-parties when absent Class members are compensated for only half their losses, (2) conceals the identity of such third-parties from absent Class members, depriving absent Class members of an opportunity to assess the fairness or reasonableness of *cy pres* recipients and awards, and (3) grants P&G "sole discretion" to designate such recipients and awards.**

*"Cy pres distributions, while in our view permissible, are inferior to direct distributions to the class because they only imperfectly serve the purpose of the underlying causes of action—to compensate class members."*[14]

Under the settlement in this case, P&G would obtain a release of any and all related claims of a Class who, between 2009 and 2013, purchased over 9.5 million packages of Align. [Final Order, RE 179, at Page ID#: 8593]. In exchange, P&G would pay out up to $15 million in cash refunds (between $15.88 and $49.26 per person) and between $5 million and $10 million worth of "in-kind" benefits to an as-yet-unknown number of as-yet-undisclosed and uninjured organizations of P&G's choosing.

Making a conspicuous effort to avoid the characterization of these in-kind benefits as controversial *cy pres* awards, the parties prefer to call these third-party

---

[14]*In re Baby Prods. Antitrust Litig.*, 708 F.3d 163, 169 (3rd Cir. 2013).

gifts "Digestive Health Improvement Contributions" ("DHIC")). [Final Order, RE 179, at Page ID#: 8588-89].    Unfortunately, the District Court surrendered to expediency and took the parties' word that the DHIC – nothing more than thinly-disguised *cy pres*[15] awards – would "directly benefit" Class members.    There is, however, no evidence in the record that Cain or any other absent Class member would ever benefit, directly or otherwise, from P&G's donation of these in-kind benefits to uninjured third-party organizations.    Yet, despite the fact that 151,445 claims were submitted with two and a half months to go before the deadline, Class Counsel and P&G inexplicably diverted up to $10 million worth of settlement benefits – rightly belonging to injured Class members only be partly-compensated by cash refunds – to unidentified organizations chosen solely by P&G.    These distributions largely undermine the fairness of the overall settlement and the District Court abused its discretion by approving it.

---

[15]"*Cy pres*" is a term meaning "as near as possible" and in class action settlements refers to the parties' plan for the "next best use" of the settlement funds that cannot be distributed to class members or remains unclaimed following the distribution.    *Knuckles v. Mary Jane Elliott, PC*, 2016 U.S. Dist. LEXIS 94858, at *5-6 (E.D. Mich. July 20, 2016) (citing *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011)).

1.   **Digestive Health Improvement Contributions
     ("DHIC") – a negotiated term of settlement
     agreement – is a *cy pres* remedy subject to
     fairness and adequacy considerations.**

*Cy pres* originated in trust law.  Short for the French "*cy près comme possible*,"
or "as near as possible," it referred to a court's power, typically under statute, "to
save testamentary charitable gifts that would otherwise fail." *Klier v. Elf Atochem
N. Am., Inc.*, 658 F.3d 468, 473-74 (5th Cir. 2011); *see generally* Martin H. Redish
et al., *Cy Pres Relief and the Pathologies of the Modern Class Action: A Normative
and Empirical Analysis*, 62 Fla. L. Rev. 617, 625 (2010) ("*Redish*").[16]  Notably,
although the District Court concluded that DHIC is not a *cy pres* award because it
was "separate and independent from" direct payments to Class members [Final Order,
RE 179, at Page ID#: 8609], this is against the great weight of authority and
scholarship.  By any reasonable account, DHIC is a *cy pres* remedy.

In class actions, settlement agreements expressly provide for awards to
charities or foundations in addition to, or in place of, funds earmarked for distribution
to class members. *Redish*, at 656–57.  *Cy pres* awards generally refer to *any* class
action award given to charitable or other non-profit organizations that have a purpose

---

[16]For example, a 19th- century court applied the doctrine to re-purpose
a trust created to support the abolition movement to instead provide assistance
to poor African-Americans. *Jackson v. Phillips*, 96 Mass. 539 (1867).

related to the underlying cause of action.  *See* Christine P. Bartholomew, *Saving Charitable Settlements*, 83 Fordham L. Rev. 3241, 3250 (2015) ("*Bartholomew*").

Federal courts use *cy pres* as a remedy in the class action context under two related but distinct scenarios.  First, *cy pres* can be used when settlement funds go unclaimed.  Cecily C. Shiel, *Note, A New Generation of Class Action Cy Pres Remedies: Lessons from Washington State*, 90 Wash. L. Rev. 943, 950 (2015).  The excess funds are often a consequence of failing to locate absent class members, absent class members failing to file their claims, or absent class members failing to cash their checks.  *Id*.  Alternatively, excess funds may result when it is economically impracticable to send awards to absent class members.  *Id*.

Second, as here, *cy pres* remedies may be included as part of settlement agreements themselves.  *Redish*, at 653; *see also Note: Class Action Settlements, Cy Pres Awards, and the Erie Doctrine*, 111 Nw. U.L. Rev. 1097, 1104 (2017).  In these instances, the parties agree, as part of the settlement, that a portion of the settlement [or benefits] will go to a designated charity.  *See* Jennifer Johnston, *Comment, Cy Pres Comme Possible to Anything is Possible: How Cy Pres Creates Improper Incentives in Class Action Settlements*, 9 J.L. Econ. & Pol'y 277, 284 (2013) ("In its

modern form [*cy pres*] permits the distribution of funds to uninterested parties before there are even any residual funds left over.").[17]

Facing no resistance from class counsel, defendants use *cy pres* awards to structure settlements to minimize their costs or even benefit themselves.   For example, the *Lane v. Facebook* settlement directed all of its *cy pres* to a new charity "to be funded by Facebook, partially controlled by Facebook, and advised by a legal team consisting of Facebook's counsel and their own purported counsel." 696 F.3d 811, 835 (9th Cir. 2012) (Kleinfeld, J., dissenting), *reh'g denied*, 709 F.3d 791 (9th Cir. 2013), *cert. denied sub nom. Marek v. Lane*, 134 S. Ct. 8 (2013).[18]

The Facebook case was the first time the Supreme Court addressed *cy pres* awards as a class action remedy.   There, a class of plaintiffs alleged Facebook violated their privacy rights as a result of the Beacon program, which updated Facebook members' profiles based on actions the members took on websites that

---

[17]*See Bartholomew*, 83 Fordham L. Rev. at 3250 (discussing *cy pres* in the context of class action settlements and noting that *cy pres* can refer to the distribution of leftover settlement funds to a charity or to a settlement that designated a charity as a recipient of funds at the outset).

[18]Similarly, Microsoft attempted to resolve an antitrust class action by directing a *cy pres* donation of computers and software to schools – which the court suggested was an attempt to flood the educational market with Microsoft products at the expense of then-market leader Apple. *In re Microsoft Corp. Antitrust Litig.*, 185 F. Supp. 2d 519, 528 (D. Md. 2002).

contracted with Facebook. *Id.* at 816. The parties agreed to a $9.5 million settlement. $6.5 million took the form of an award to a new organization to provide education on online privacy law. *Id.* at 817. Notably, Facebook's Director of Public Policy was one of three individuals selected to serve on the board of directors of the new organization, and Facebook's counsel sat on the organization's Board of Legal Advisors. *Id.* at 817-18. Thus, because Facebook maintained significant control over the *cy pres* recipient – the new organization – there were serious concerns about the award and a potential conflict of interest. *See* Rhonda Wasserman, *Cy Pres in Class Action Settlements*, 88 S. Cal. L. Rev. 97, 133 (2014).

The Ninth Circuit affirmed, holding that the settlement as a whole – including the *cy pres* award – was "fundamentally fair," satisfying Rule 23(e). *Facebook*, 696 F.3d at 825. The court held that it was infeasible to provide monetary payments to absent class members and that there was a sufficient nexus between the organization and the harm plaintiffs suffered. *Id.* at 821. Judge Kleinfeld dissented, asserting the settlement failed to meet the "higher standard of fairness" required to satisfy Rule 23(e). *Id.* at 831 (Kleinfeld, J., dissenting). Judge Kleinfeld was concerned about the incentives for collusion, noting "there [was] nothing to stop Facebook and class counsel from managing the charity to serve their interests." *Id.* at 834.

In a remarkable turn of events, even though the Supreme Court denied certiorari, Chief Justice Roberts issued a statement from the bench, stating that when a more suitable case presented itself, the Court should consider "when, if ever, [*cy pres*] relief should be considered" and should "clarify the limits on the use of such remedies." *Marek v. Lane*, 134 S. Ct. 8, 9 (2013).[19]

> **2.   The settlement is unfair, inadequate and unreasonable because it allocates up to $10 million in in-kind *cy pres* benefits to an unknown number of undisclosed and uninjured third-parties even though absent Class members are just partly compensated for their losses.**

By definition, *cy pres* awards are inferior to any remedy that directly compensates class members.  Here, Class members may receive half their losses. Meanwhile, P&G will distribute – in its sole discretion – up to $10 million worth of so-called "in-kind" benefits to an unknown number of undisclosed and uninjured third-parties.  If, as the District Court implicitly found, these benefits actually constitute *real value*, it is unreasonable to divert those benefits away from absent Class members – whose claims made this action possible and gave that Court

---

[19]Specifically, he was interested in examining "how to assess … fairness [of *cy pres*] as a general matter," how to choose entities to receive the *cy pres* award, whether new entities could be formed as part of the relief, how to delineate responsibility between the judge and parties in forming the *cy pres* remedy, and "how closely the goals of any enlisted organization must correspond to the interests of the class." *Id*.

jurisdiction – when not a single absent Class member would be more than half-compensated for his losses.

The District Court rejected Cain's objection – that *cy pres* here is unfair because it unjustly doles out benefits belonging to Class members to *cy pres* recipients – by reasoning Cain did not "cite to any authority holding that distributions cannot be made to third parties until Settlement Class Members have been compensated for every dollar of alleged damage." [Final Order, RE 179, at Page ID#: 8613]. The District Court further reasoned that "the DHIC is <u>not</u> a cy pres award" at all because "contributions like the DHIC that are separate and independent from – and do not diminish – direct payments to class members are not cy pres awards." [Final Order, RE 179, Page ID#: 8609].

***The "trigger requirement."*** Importantly, in order to justify a *cy pres* remedy, courts have created a "trigger requirement," requiring some difficulty in distributing settlement awards to class members. *Bartholomew*, at 3252-53. For example, some courts require that it be "infeasible" to compensate actual class members before providing a *cy pres* award to a non-profit organization, *see, e.g., In re Matzo Food Prods. Litig.*, 156 F.R.D. 600, 605 (D. N.J. 1994) ("Typically, the court employs *cy pres* where … distribution [is] economically impossible."), while others have no such requirement. *See, e.g., Baby Prods.*, 708 F.3d at 173 (holding that it is not the job of

the court "to determine whether the settlement is the fairest possible resolution" and thus declining "to hold that *cy pres* distributions are only appropriate" where further individual distributions are economically infeasible).

The preference for direct distributions to class members is reflected in the American Law Institute's *Principles of the Law of Aggregate Litigation* § 3.07 (2010) ("*ALI Principles*"), which provide that "settlement proceeds should be distributed directly to individual class members" if "individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable." *ALI Principles*, § 3.07(a), at 217.[20]

---

[20]Those principles instruct that in determining whether a *cy pres* award is appropriate, courts should apply the following criteria:

> (a) If individual class members can be identified through reasonable effort, and the distributions are sufficiently large to make individual distributions economically viable, settlement proceeds should be distributed directly to individual class members.

> (b) If the settlement involves individual distributions to class members and funds remain after distributions (because some class members could not be identified or chose not to participate), the settlement should presumptively provide for further distributions to participating class members unless the amounts involved are too small to make individual distributions economically viable or other specific reasons exist that would make such further distributions impossible or unfair.

Multiple courts of appeals have adopted that approach expressly or in substantial part. *See In re BankAmerica*, 775 F.3d at 1064 (adopting *ALI Principles*); *Klier*, 658 F.3d at 475 (same); *see also Pearson*, 772 F.3d at 784 ("A *cy pres* award is supposed to be limited to money that can't feasibly be awarded to the intended beneficiaries, here consisting of the class members."); *Baby Prods.*, 708 F.3d at 173-174 (explaining, without fully adopting *ALI Principles*, that "direct distributions to the class are preferred over *cy pres* distributions").

Significantly, there is no factual dispute in this case regarding the feasibility of distributing benefits to absent Class members, since at least 151,445 Class members had already submitted claims well before the claims deadline. [Final Order,

---

© If the court finds that individual distributions are not viable based upon the criteria set forth in subsections (a) and (b), the settlement may utilize a *cy pres* approach. The court, when feasible, should require the parties to identify a recipient whose interests reasonably approximate those being pursued by the class. If, and only if, no recipient whose interests reasonably approximate those being pursued by the class can be identified after thorough investigation and analysis, a court may approve a recipient that does not reasonably approximate the interests being pursued by the class.

*ALI Principles*, § 3.07.

RE 179, at Page ID#: 8591].[21]

Along with this so-called "trigger requirement," courts have also designed a "nexus requirement," mandating "a connection – or nexus – between the harm that the plaintiffs have suffered and the benefit the *cy pres* distribution will provide." William B. Rubenstein, *Newberg on Class Actions,* § 12.33 n.3 (5th ed.) (discussing circuit and district court cases requiring a nexus from the First, Third, Fifth, Eighth, Ninth, Tenth, Eleventh, and D.C. Circuits). For instance, the Ninth Circuit has held that to meet the nexus requirement, "[a] *cy pres* award must be guided by (1) the objectives of the underlying statute(s)," "(2) the interests of the silent class members," and (3) "must not benefit a group too remote from the plaintiff class." *Dennis v. Kellogg Co.*, 697 F.3d 858, 865 (9th Cir. 2012) (citations and internal quotation marks omitted); *see also Nachshin v. AOL,* 663 F.3d 1034, 1038-39 (9th Cir. 2011).[22]

---

[21]In an altogether unsupported statement, the Agreement states that "[t]he DHIC reflect the difficulty in locating consumers who purchased these products during the Class period, to ensure that those who do not receive a cash payment because it is not possible to locate them will nonetheless receive a meaningful settlement benefit." [Motion for Final Approval, RE 170, at Page ID#: 7148].

[22]In contrast, the Third Circuit recently added the requirement that courts must evaluate *cy pres* awards as part of a class settlement based on "the degree of *direct benefit* provided to the class." *Baby Prods.*, 708 F.3d at 174 (emphasis added).

Clearly courts have a duty to examine *cy pres* distributions to assure that they are the "next best" remedy to direct payments to class members. *Knuckles v. Mary Jane Elliott, PC*, 2016 U.S. Dist. LEXIS 94858, at \*12-13 (E.D. Mich. July 20, 2016) (citing *Nachshin v. AOL, LLC*, 663 F.3d 1034, 1038 (9th Cir. 2011)). *Cy pres* payments, like those approved here, can be approved when actual funds are "non-distributable," or "'where the proof of individual claims would be burdensome or distribution of damages costly.'" *New York State Teachers' Ret. Sys. v. GM Co.*, 315 F.R.D. 226, 241 (E.D. Mich. 2016) (citing *Nachshin*, 663 F.3d at 1038) (quoting *Six Mexican Workers v. Ariz. Citrus Growers*, 904 F.2d 1301, 1305 (9th Cir. 1990)).

Because the District Court mistook the DHIC distributions as something other than *cy pres* awards, it also failed to examine them in order to assure that they are the "next best" remedy to direct payments to absent Class members. *See Knuckles*, at \*12-13. But still, even if the District Court had been correct (it was not), any settlement's allocation plan must meet Rule 23 standards. *In re Lucent Technologies, Inc. Sec. Litig.*, 307 F. Supp. 2d 633, 649 (D. N.J. 2004) ("Approval of a plan of allocation of a settlement fund in a class action is governed by the same standards of review applicable to approval of the settlement as a whole: the distribution plan must be fair, reasonable, and adequate").

And so, the fundamental problem with the allocation of DHIC settlement benefits is that such proceeds, "having been generated by the value of the class members' claims, belong solely to the class members." *Klier*, 658 F.3d at 474 (citing *ALI Principles* § 3.07 cmt. (b)).[23]  "There is," after all, "no constitutional principle that gives one person the right to give another's property to a third party." *Caplin & Drysdale, Chartered v. United States*, 491 U.S. 617, 628 (1989).  Since the settlement at issue here directs a substantial portion of settlement benefits away from injured Class members who own them to an unknown number of undisclosed and uninjured third-parties, it cannot meet Rule 23's fairness standards, much less the requirement that it be the "next best" remedy absent for Class members.

That absent Class members would be only partially-compensated is important. Notably, other Courts of Appeals have approved *cy pres* distributions where all class members submitting claims have already been *fully compensated* for their damages by prior distributions. *See, e.g., In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 34-35 (1st Cir. 2012).[24]  Plainly, a *cy pres* distribution is appropriate in such

---

[23]The Seventh Circuit stated the problem plainly: "There is no indirect benefit to the class from the defendant's giving the money to someone else." *Mirfasihi v. Fleet Mortg. Corp.*, 356 F.3d 781, 784 (7th Cir. 2004).

[24]A *cy pres* distribution which would only become operational once all class members have been fully compensated is, as such, unobjectionable. *See In re Tyco Intern. Ltd. Multidistrict Litig.*, 535 F. Supp.2d 249, 262 (D. N. H. 2007) ("The

circumstances because additional individual distributions would "overcompensat[e]

claimant class members at the expense of absent class members." *In re Baby Prods.*,

at 176.  However, where, as here, it is still logistically feasible and economically

viable to make additional pro rata distributions to absent Class members, a district

court should do so, except, as noted above, where an additional distribution would

provide a windfall to class members. *Klier*, 658 F.3d at 475.[25]

The bottom line is that a *cy pres* distribution puts settlement benefits to their

"next-best use' by providing an indirect benefit to the class.  That option arises,

however, only if it is not possible to put those funds to their *very best use*: benefitting

---

plan calls for the continued re-distribution of unclaimed funds to class members
according to their pro rata shares, until the costs of such redistributions make it
economically unfeasible to continue doing so. If and when that point is reached,
then the balance of the fund will be subject to a *cy pres* remedy."); *Government
Employees Hosp. Ass'n v. Serono Intern., S.A.*, 246 F.R.D. 93, 95 (D. Mass. 2007)
(settlement amount "specifically allocated" to class members; "This amount was
expected to be sufficient to fully pay all of the claims"; "Any excess was to be
distributed as a *cy pres* fund"). *See also In re Relafen Antitrust Litig.*, 231 F.R.D.
52, 82 (D. Mass. 2005) (*cy pres* award made only after "great efforts to ensure that
individual consumers" were rewarded and "in light of the very weakness of the
claims" of some subclass members).

[25]In short, a "*cy pres* award is supposed to be limited to money that can't
feasibly be awarded to the intended beneficiaries." *Pearson v. NBTY, Inc.*, 772
F.3d 778, 784 (7th Cir. 2014).  This will occur, for example, when "the amounts
involved are too small to make individual distributions economically viable." *ALI
Principles,* § 3.07(b).  It is only at this point that a district court has discretion to
order a *cy pres* distribution. *See Klier*, 658 F.3d at 475 n.15 (internal citation
omitted).

class members directly. *Klier*, 658 F.3d 468 at 475; *see BankAmerica*, 775 F.3d at 1063-64. Here, neither the parties nor the District Court identified legitimate reasons for which further distributions to absent Class members would be impossible, impracticable, inefficient or unfair. *See ALI Principles*, at § 3.07(b).[26]

Accordingly, the parties' desire to assign a large portion of settlement benefits to unidentified third-parties – to be designated by P&G in its sole discretion – is therefore without lawful foundation, and the District Court's endorsement of DHIC as a "direct settlement benefit" was a clear abuse of discretion.

---

[26]Incidentally, if it is really the case that it is impossible to distribute settlement proceeds to Class members, then class certification would also be inappropriate. "If the class settlement does not provide effectual relief to the class and its principal effect is to induce the defendants to pay the class's lawyers enough to make them go away, then the class representatives have failed in their duty under Rule 23 to fairly and adequately protect the interests of the class." *In re Subway Footlong Sandwich Mktg. & Sales Practices Litig.*, 869 F.3d 551, 556 (cleaned up). Likewise, the class device cannot be a superior means of resolving litigation if settlement benefit does not distinguish between class members and non-class members: a faithful agent for the class would costlessly opt-out every single absent class member from the settlement rather than waive their rights.

3.   **The settlement is unfair, inadequate and unreasonable because it conceals the identity of prospective *cy pres* recipients from absent Class members and also deprived absent Class members of any opportunity to assess the fairness or reasonableness of those recipients and/or awards.**

In addition to the substantive impropriety of the *cy pres* component, notice was also defective because – without dispute – it omitted material aspects of the *cy pres* provision, *i.e.*, the identity of DHIC recipients. The District Court rejected Cain's notice objection, reasoning without further analysis that "there is no requirement that the ultimate recipients of the DHIC be disclosed prior to settlement approval." [Final Order, RE 179, at Page ID#: 8614].[27]

_____

[27]In pertinent part, the notice provided:

> In addition to these cash refunds, P&G will make Digestive Health Improvement Contributions ("DHIC"). The DHIC will be targeted to benefit directly the Settlement Class; namely, U.S. consumers who suffer from Irritable Bowel Syndrome ("IBS") or who regularly seek assistance and care for their digestive health. P&G will provide the Guaranteed DHIC in the form of: (1) intellectual property and/or know-how; (2) research or education grants; or (3) product donations to research or educational institutions or programs working to improve digestive health.

[Agreement, RE166-2, at Page ID#: 6944].

Put simply, the failure of the notice to identify even a single proposed recipient substantially precluded Cain and other absent Class members from being able to properly exercise their right to object to the settlement.[28]  As discussed above, there can be little, if any, dispute that a *cy pres* award "will be rejected when the proposed distribution fails to provide the 'next best' distribution." *Six Mexican Workers*, 904 F.2d at 1308 (such distribution must "adequately target the plaintiff class)." Yet here, Cain and other absent Class members – *to this day* – do not know the identity of a single prospective *cy pres* recipient.

Fundamentally, the strictures of due process demand that notice to absent class members fairly apprise them of the terms of the settlement such that they might have a meaningful opportunity to voice their objections.  Under *Mullane v. Central Hanover Bank*, the constitutional imperative is that settlement "notice must be of such nature as reasonably to convey the required information, and it must afford a

---

[28]All Class Counsel have said about it is that "[t]he Parties have already starting working on a worthy recipient of DHIC contributions." [Motion for Final Approval, RE 170, at Page ID#: 7169].

-38-

reasonable time for those interested to make their appearance." 339 U.S. 306, 314 (1950).[29] That standard is not met where the identity of *cy pres* beneficiaries – and award amounts – are concealed from absent Class members.

The rationale of the notice requirement is that it allows "the parties to make conscious choices that affect their rights in a litigation context." *See* 2 *Newberg on Class Actions*, § 8.04 at 8-17; 7B Charles Alan Wright et al., *Federal Practice and Procedure*, § 1787 at 220 (2d ed. 1986). It also gives class members "the information 'needed to decide, intelligently, whether to stay in or opt out. . . '" *In re Diet Drugs Prods. Liab. Litig.*, 385 F.3d 386, 395 (3rd Cir. 2004); *In re Veritas Software Corp. Secs. Litig.*, 496 F.3d 962, 969 (9th Cir. 2007) ("It is clear that the purpose of the notice requirement is to allow class members to evaluate a proposed settlement."); 2 *Newberg on Class Actions*, § 8.04 at 8-17 ("[T]he purpose [of notice is] allowing the parties to make conscious choices that affect their rights in a litigation context.").

Notice, therefore, allows class members a sound platform from which they may assess the strengths and weaknesses of the case and the merits and demerits of the settlement. Accordingly, when a notice includes material inaccuracies or omits salient information about the settlement, it does not comport with the *Mullane*

---

[29]Although *Mullane* did not involve a Rule 23 class action, it long has been held to apply equally to absent class members in such actions. *See Phillips Petroleum Co. v. Shutts*, 472 U.S. 797, 811-12 (1985).

standard. *See, e.g., In re Katrina Canal Breaches Litig.*, 628 F.3d 185, 198 (5th Cir. 2010) (notice failed to clearly inform class members of the possibility of a *cy pres* distribution).

Here, the identity of *cy pres* recipients is clearly material to the settlement.[30] Absent Class members, after all, have a fundamental right to know where settlement benefits – created by their own claims – will wind up, and the District Court should not have approved the settlement without providing Cain and other absent Class members a full and fair opportunity to object to prospective recipients.

This failure undermines the settlement's fairness, adequacy and reasonableness. For example, without knowing the identity of recipients, absent Class members cannot determine whether the DHIC qualifies "as the next best distribution to giving the funds directly to class members." *Dennis,* 697 F.3d at 865. After all, if the parties do not establish that the potential recipient has an appropriate nexus to the putative class and their claims, the settlement cannot be approved. *Custom LEC v. eBay, Inc.*, 2013 U.S. Dist. LEXIS 122022, at *19-*20 (N.D. Cal. Aug. 27, 2013). *See Dennis*, 697 F.3d at 867 (rejecting settlement because "by failing to identify the *cy pres*

---

[30]Nor do the settlements provide any mechanism for absent Class members to provide input regarding the selection of *cy pres* recipients or even to receive notice of the identities of such recipients once they are selected.

recipients, the parties have restricted our ability to undertake the searching inquiry that our precedent requires").[31]

Contrary to the District Court's unsupported finding, there is support for the proposition that *cy pres* beneficiaries must be disclosed with particularity at the time of settlement. *Dennis* is a case in point. There, the benefits provided by the settlement agreement included (1) $2.75 million, used to pay eligible claimants up to $15 each; (2) donation of any left-over funds – which, ultimately, amounted to almost $2 million – "to unidentified 'charities chosen by the parties and approved by the Court pursuant to the *cy pres* doctrine'"; and (3) donation of $5.5 million worth of specific Kellogg food items to charities that feed the indigent. *Id*. at 862-63. The district court granted final approval to the settlement agreement, but the appellate court reversed, in part because the agreement did not specifically identify the *cy pres*

---

[31]In an opt-out settlement, providing the identity of potential *cy pres* recipients also preserves the right of absent class members to distance themselves from causes or institutions that they would rather not support. Requiring class members to surrender their rights to "subsidize speech by a third party that he or she does not wish to support" raises serious First Amendment concerns. *Harris v. Quinn*, 134 S. Ct. 2618, 2644 (2014).

recipients. The *Dennis* court added that its "concerns are not placated by the settlement provision that the charities will be identified at a later date and approved by the court." *Id*. at 867.[32]

Importantly, another appellate decision sets out an approach for choosing between *Dennis* and *Baby Prods*. In *BankAmerica Corp. Sec. Litig.*, 775 F.3d 1060 (8th Cir. 2015), after the district court granted final approval of a class action settlement, the claims process proceeded to the point where $2.44 million remained in the $333.2 million settlement fund. *Id*. at 1062. Class counsel asked that this remainder be distributed as follows: (1) a final, additional attorney fee award of

---

[32]The Third Circuit, in *In Baby Prods. Antitrust Litig.*, 708 F.3d 163, 180 (3d Cir. 2013), disagreed with *Dennis*. There, the court reversed final approval and remanded for further consideration  because the district court could not have known how large a portion of the settlement funds would ultimately be distributed to *cy pres* instead of to the class – $18.5 million out of the $35.5 million settlement. But the court also held that the "failure to identify the *cy pres* recipients [in the settlement agreement and class notice] is not a due process violation," because 'Class members know there is a possibility of a *cy pres* award and that the Court will select among recipients proposed by the parties at a later date." *Id*. at 180.

While Cain agrees with and relies upon the *Baby Products* decision for other propositions [Cain Objection, RE 174, at Page ID#: 7354-55], he simply disagrees with that decision on the necessity of informing absent Class members where a substantial part of the settlement benefits are going, particularly since the parties agreed that these distributions constitute "direct benefits" to the absent Class members. Such an argument – that absent Class members are not entitled to know this information – cannot be made in good faith.

$98,000; and (2) the rest ($2.34 million) to three charities suggested by class counsel. *Id.* The district court granted the motion, but the United States Court of Appeals for the Eighth Circuit reversed, finding several problems with the *cy pres* distribution process, including the large amount and the choice of recipients. *Id.* at 1064-67.

The Eight Circuit also discussed under what circumstances notice will be inadequate for failing to identify the *cy pres* recipients:

> "[The objector] argues that the award must be reversed because [class counsel] did not notify the class of its motion for a *cy pres* distribution. We agree that, unless the amount of funds to be distributed *cy pres* is de minimis, the district court should make a *cy pres* proposal publicly available and allow class members to object or suggest alternative recipients before this court selects a *cy pres* recipient. This gives class members a voice in choosing a 'next best' third party [*cy pres* recipient] and minimizes any appearance of judicial overreaching."

*BankAmerica,* 775 F.3d at 1066 (citing *Baby Prods.*, 708 F.3d at 180).

Here, the DHIC distribution will be substantial – as much as $10 million. Accordingly, as the Eighth Circuit rightly suggests, notice should have disclosed the identity of prospective DHIC recipients to allow absent Class members to object or suggest alternative recipients. Because the District Court wrongly upheld this constitutionally-deficient notice, it abused its discretion and its judgment should be vacated and the case remanded for further proceedings.

-43-

4.    **The settlement is unfair, inadequate and unreasonable because Class Counsel improvidently granted P&G "sole discretion" to designate all *cy pres* recipients and awards.**

In an incredible lapse of judgment and fiduciary responsibility, Class Counsel ceded complete discretion to P&G to award between $5 million and $15 million in DHIC to whomever it sees fit:

> "sole discretion to select the recipients of, and form and combination of, the Guaranteed DHIC provided, including any combination of (1)-(3), above, subject to prior review and approval by Class Counsel. Class Counsel shall not unreasonably withhold such approval, which may be withheld for good cause only."

[Agreement, RE 166-2, at Page ID#: 6894]. Consequently, the beneficiaries of the *cy pres* remedy – as well as their specific awards – are subject to the whims, caprices and motives of P&G. In an equally alarming breach of duty, the District Court implicitly endorsed Class Counsel's lapse in judgment, failing to even address Cain's concern about giving P&G complete discretion to name *cy pres* recipients.

However, as discussed above, the *cy pres* plan must meet Rule 23 standards. *See In re Lucent*, 307 F. Supp. 2d at 649. Because P&G negotiated a settlement whereby it retained sole discretion to select DHIC recipients and awards – to the

exclusion of Cain and other absent Class members, preventing the latter from having

any input in the selection of recipients on the front-end of the settlement or the back-

end – the *cy pres* component does not meet Rule 23's fairness standards.

Simply put, the failure of Class Counsel to put the interests of the Class first

in negotiating this settlement, *i.e.*, by negotiating a *cy pres* component that surrenders

practically all discretion as to recipients and awards to P&G, raises severe Rule

23(a)(4) concerns.

> **B.**     **The District Court Abused its Discretion by Failing to Apply a Heightened Level of Scrutiny to the Settlement Terms to Uncover Collusion Because the Settlement Agreement Is Rife with Multiple Signs of Collusion.**
>
> **1.**     **The undisputed presence of a clear-sailing agreement required the district court to use heightened scrutiny in reviewing the settlement.**

Class Counsel negotiated a deal whereby P&G would not object to Class

Counsel's $4.5 million fee/expense request.[33]   The provision, known as a

"clear-sailing" clause, *see In re Whirlpool Corp. Front-Loading Washer Prods. Liab.

Litig.*, 2016 U.S. Dist. LEXIS 130467, at *58-61 (N.D. Ohio Sept. 23, 2016), is an

agreement on the amount of attorney's fees whereby "the party paying the fee agrees

---

[33][Agreement, RE 166-2, at Page ID#: 6906] ("Class Counsel shall make, and Defendant agrees not to oppose, an application for an award of attorneys' fees and reimbursement of expenses not to exceed $4,500,000").

-45-

not to contest the amount to be awarded by the fee-setting court so long as the award

falls beneath a negotiated ceiling." *Gooch*, 672 F.3d at 425.

In the District Court, Cain maintained that the clause was a sign of collusion,

and by itself, required the District Court to apply a heightened level of scrutiny to the

settlement. [Cain Objection, RE 174, Page ID#: 7359-61]. More than this, Cain

argued other aspects of the settlement, *i.e.*, the *cy pres*, strongly suggest the settlement

is the product of collusion.[34]

To its credit, the District Court did not simply ignore the clear-sailing

agreement. [Final Order, RE 179, at Page ID#: 8615]. Nonetheless, it greatly

underestimated how the very presence of the provision was itself evidence of possible

collusion, thereby casting doubt on the fairness of the settlement as a whole and the

adequacy of Class Counsel's representation. *See* Rule 23(e)(2), (g)(4).

---

[34]For instance, Cain argued that Class Counsel negotiated a *cy pres* component whereby as much as $10 million worth of benefits rightfully belong to absent Class members would be diverted to an unknown number of undisclosed entities selected by P&G (which the parties designated as "DHIC"). Worse still, these DHIC distributions would occur notwithstanding the undisputed fact that absent Class members would receive, at most, just half of their out-of-pocket losses. And as if this was not bad enough, the identities of *cy pres* recipients were unfairly concealed from absent Class members during the settlement process, therefore precluding them from assessing the propriety of *cy pres* in this case. [Cain Objection, RE 174, at Page ID#: 7359-61].

Pointing to two decisions by this Court, the District Court observed that clear-sailing agreements "do not, by themselves, demonstrate collusion," and concluded that "the mere fact that Defendant agreed to not contest Plaintiffs' Counsels' fee request is insufficient to demonstrate collusion." [Final Order, RE 179, at Page ID#:8615]. The District Court found "[n]othing before the Court suggests that the Settlement is the result of fraud or collusion." [Final Order, RE 179, at Page ID#: 8597].

Make no mistake, endorsing a rule requiring evidence of collusion before rejecting a class action settlement – as the District Court did – would only green-light abusive settlements. *Dry Max Pampers*, 724 F.3d at 717-18 (non-collusive adversarial process does not protect absent class members from class counsel's breach of fiduciary duty). This Court, after all, has held that while clear-sailing agreements have never been held to be unlawful per se, courts do recognize that their inclusion in a settlement gives the district court "a heightened duty to peer into the provision and scrutinize closely the relationship between attorneys' fees and benefit

to the class." *Gascho*, 822 F.3d at 291 (citation omitted).  Thus, it was the District Court's duty to engage in heightened scrutiny when confronted by the clear-sailing clause, and make some effort to uncover collusion.[35]

At any rate, the District Court did none of this.  Instead, it sidestepped Cain's actual objection – that as a sign of collusion, the clear-sailing clause required heightened scrutiny – and nixed any inquiry about collusion.  If the District Court had even attempted to engaged in such scrutiny, it might have inquired into what Class Counsel surrendered to extract P&G's agreement not to oppose their fee or recognized the concealed details of the *cy pres* component – yet another sign of collusion – and made an effort to uncover still other, less obvious signs of collusion.

Besides, this Court has directed district courts to be especially wary when class action parties agree not to contest fees.  *See Gooch*, 672 F.3d at 426.  The problem is the

> defendant won't agree to a clear-sailing clause without compensation – namely *a reduction in the part of the settlement that goes to the class members*, as that is the only reduction class counsel are likely to consider.

---

[35]Because collusion "may not always be evident on the face of settlement, . . . [courts] must be particularly vigilant not only for explicit collusion, but also for more subtle signs that class counsel have allowed pursuit of their own self-interest . . . to infect the negotiations."  *In re Bluetooth Headset Prods. Liab. Litig.*, 654 F.3d 935, 947 (9th Cir. 2011).

*Redman v. Radioshack Corp.*, 768 F.3d 622, 637 (7th Cir.2014), *cert. denied sub*

*nom. Nicaj v. Shoe Carnival, Inc.*, 135 S. Ct. 1429 (2015) (emphasis added).

> **2.    The District Court failed to inquire into Class**
> **Counsel's negotiations of the clear-sailing**
> **agreement to discover the price absent Class**
> **members had to pay for that agreement.**

Here, the District Court was bound to assure itself that Class Counsel's fee was

not pre-decided or that counsel engaged in collusive and adverse actions in

connection with this fee. To that point, "[i]t is unlikely that a defendant will

gratuitously accede to the plaintiffs' request for a 'clear sailing' clause without

obtaining something in return. That something will normally be at the expense of the

plaintiff class." *Malchman v. Davis*, 761 F.2d 893, 908 (2d Cir. 1985) (Newman, J.,

concurring), *abrogated on other grounds by Amchem Products, Inc. v. Windsor*, 521

U.S. 591 (1997). In other words, "the very existence of a clear-sailing provision

increases the likelihood that class counsel will have bargained away something of

value to the class." *Weinberger v. Great N. Nekoosa Corp.*, 925 F.2d 518, 525 (1st

Cir. 1991).

Accordingly, the promise from P&G not to oppose Class Counsel's fee did not

come without a price, unwittingly paid by absent Class members. Not surprisingly,

because the District Court chose not to delve into the issue, the record is silent as to

what Class Counsel gave away in return for P&G's agreement. Absent evidence to the contrary, the agreement is indicative of severe mis-alignment between the interests of absent Class members on one hand and Class Counsel on the other.

> **3.  The controversial *cy pres* component is significantly undermined by numerous signs of collusion and/or conflicts that the District Court ignored.**

While it is true that in *Gascho*, this Court noted that the inclusion of a clear-sailing agreement, "absent more," does not show that a district court abused its discretion in approving a settlement, 822 F.3d at 292, here, the provision is just one of several signs of collusion. By protecting their own interests – structuring a settlement providing them a $4.5 million fee while paying Class members less than $50 a piece, failing to insist that notice sufficiently informed absent Class members of the number and identity of DHIC recipients, giving P&G virtually unfettered discretion over distribution of *cy pres* benefits purportedly intended to "directly benefit" absent Class members but which will really have little or no meaningful benefit to them, and inserting a "clear-sailing" agreement into the settlement – Class Counsel appears to have largely abandoned their duty to adequately represent Class members.

Despite this demonstrable abandonment, the District Court failed to properly scrutinize the deal and concluded Cain had not shown collusion. In doing so, the District Court also failed to perform its role as guardian of absent Class members, disregarding telltale signs of collusion and/or conflicts. For example, although *cy pres* settlements raise "fundamental concerns" about the fairness of such relief, *Marek v. Lane*, 571 U.S. 1003, 1006 (2013) (Roberts, C.J.,), the District Court expressed no concern at all about the DHIC.[36]

*First*, notwithstanding the parties' and the District Court's suggestions to the contrary, *cy pres* relief provides no direct benefit at all to Class members. That is a significant "red flag[]," because the Class's injuries are the very basis for the lawsuit. *Newberg on Class Actions*, § 13:56, at 489. Class members are thus "presumptively" entitled to a share of the "funds generated through the aggregate prosecution of [their] claims," which are typically released by the settlement. *ALI Principles* § 3.07 cmt. b, at 218; *see Klier*, 658 F.3d at 474.

*Second*, *cy pres* settlements exacerbate "the perennial risk of collusion" between the parties at the expense of absent class members. *See Mirfasihi v. Fleet*

---

[36]*See also BankAmerica*, 775 F.3d at 1063 (explaining that some courts of appeals have "criticized and severely restricted the practice"); Barbara J. Rothstein & Thomas E. Willging, *Fed. Judicial Ctr., Managing Class Action Litigation: A Pocket Guide for Judges* 17 (3d ed. 2010) (identifying *cy pres* relief as a "hot button indicator[]" showing "potential unfairness" in a class- action settlement).

*Mortgage Corp.*, 356 F.3d 781, 785 (7th Cir. 2004) (noting "class actions are rife with potential conflicts of interest between class counsel and class members"). By shifting the focus of settlement negotiations from the value of plaintiffs' claims to the amount and destination of a *cy pres* contribution, the prospect of *cy pres* relief distorts incentives for class counsel and defendants alike. Class counsel often receive attorney's fees calculated as a percentage of the overall settlement fund, and "a *cy pres* distribution may increase a settlement fund, and with it attorneys' fees, without increasing the direct benefit to the class." *Baby Prods.*, 708 F.3d at 173. The incentive to maximize the *cy pres* amount rather than negotiate for more direct relief to the class creates a "potential conflict of interest between class counsel and their clients." *Id.*

Here, by using *cy pres*, Class Counsel created an illusion of direct Class relief through which it minimized the settlement's cost to P&G while increasing its own fees – all at the expense of absent Class members. The District Court viewed the settlement as having a total benefit to the Class of "at least $20.3 million," including "a minimum of $15 million in Cash Refunds and DHIC." [Final Order, RE 179, at Page ID#: 8602]. But when, as here, a court treats a dollar of *cy pres* as equivalent to a dollar of direct class recovery, class counsel's all-too-human predilection will prefer to allow defendants to inflate the settlement value by making in-kind

contributions that have no real value to Class members but serve to increase class counsel's fee-award over thousands or millions of anonymous and likely ungrateful class members.

Defendants face strong incentives to collude with class counsel and against the class as a general rule, but particularly when *cy pres* awards are used. When *cy pres* awards are in play, the incentives for collusion are even stronger. The defendants – accused of inflicting harm on a high number of plaintiffs – can lessen any public relations harm from the lawsuit by casting themselves as the source of funds to charitable or non-profit organizations. *See SEC v. Bear, Stearns & Co., Inc.*, 626 F. Supp. 2d 402, 415 (S.D. N.Y. 2009) ("In general, defendants reap goodwill from the donation of monies to a good cause").

*Third*, *cy pres* relief also creates a risk of self-dealing – or the appearance of self-dealing – by parties and, potentially, the court. By allowing the parties or the court to select the recipients of *cy pres* contributions, *cy pres* relief opens the door to apparent favoritism toward entities with which the parties or the court have prior affiliations. *See In re Lupron Mktg. & Sales Practices Litig.*, 677 F.3d 21, 38 (1st Cir.) ("[H]aving judges decide how to distribute *cy pres* awards both taxes judicial resources and risks creating the appearance of judicial impropriety."), cert. denied, 568 U.S. 932 (2012).

In the face of serious objections, the District Court simply took Class Counsel at their word, failed to apply heightened scrutiny to the settlement's terms, ignored glaring deficiencies concerning the already controversial *cy pres* component of the settlement, and altogether sidestepped its duty to guard the rights of absent Class members and uncover collusion.

## VII.   CONCLUSION

For the foregoing reasons, the District Court's judgment should be reversed and the case should be remanded for further proceedings.

Dated: August 21, 2018.

/s/   *W. Allen McDonald, Esq.*
W. Allen McDonald, Esq.
LACY, PRICE & WAGNER, P.C.
249 N. Peters Road, Suite 101
Knoxville, TN 37923
Telephone: (865) 246-0800

*Counsel for Appellant,*
*Christopher T. Cain*

## CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT, TYPEFACE REQUIREMENTS, AND TYPE-STYLE REQUIREMENTS

1.    This brief complies with the type-volume limitation of Federal Rule of Appellate Procedure 32(a)(7)(B) and Sixth Circuit Rules 28 and 32 because this brief contains 12,289 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2.    This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Sixth Circuit Rule 32 the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because this brief has been prepared in a proportionally-spaced typeface using Word Perfect X6 and Times New Roman 14-point font and is double-spaced.

Dated: August 21, 2018.

/s/  W. Allen McDonald, Esq.
W. Allen McDonald, Esq.
LACY, PRICE & WAGNER, P.C.
249 N. Peters Road, Suite 101
Knoxville, TN 37923
Telephone: (865) 246-0800

*Counsel for Appellant,*
*Christopher T. Cain*

## CERTIFICATE OF SERVICE

I, W. Allen McDonald, do hereby certify that a copy of the foregoing was filed electronically. Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt. All other parties will be served by regular U.S. Mail. Parties may access this filing through the Court's electronic filing system.

This 21st day of August, 2018.

/s/   W. Allen McDonald, Esq.
W. Allen McDonald, Esq.

| DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS | | |
|---|---|---|
| Docket No. | Description | Page ID# |
| RE 1 | Complaint | 1-43 |
| RE 9 | Amended Complaint | 62-84 |
| RE 10 | Motion to Dismiss | 103-05 |
| RE 11 | Motion to Transfer | 139-140 |
| RE 25 | Order Granting Motion to Transfer Venue | 371-74 |
| RE 28 | Order on Motion to Dismiss | 385-418 |
| RE 54 | Answer | 502-23 |
| RE 84 | Order Granting Motion for Leave to File Second Amended Complaint | 949-59 |
| RE 85 | Second Amended Complaint | 960-89 |
| RE 86 | Answer | 990-1019 |
| RE 90 | Motion fo Partial Judgment on the Pleadings | 1035-37 |
| RE 94 | Order on Motion fo Partial Judgment on the Pleadings | 1102-1110 |
| RE 108 | Motion for Class Certification | 1192-1240 |
| RE 140 | Order Granting Motion for Class Certification | 6415-6452 |
| RE 143 | Order Granting Appeal | 6649-51 |
| RE 145 | Opinion and Judgment | 6657-6699 |
| RE 147 | Supreme Court Letter | 6702 |
| RE 148 | Notice | 6703 |

| DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS | | |
|---|---|---|
| | September 25, 2017 Minute Entry | |
| RE 165 | Third Amended Complaint | 6794-6822 |
| RE 166 | Motion for Preliminary Approval of Class Action Settlement | 6823-68 |
| RE 166-2 | Settlement Agreement | 6894 |
| RE 167 | Order Granting Preliminary Approval | 7042-51 |
| RE 170 | Motion for Final Approval | 7128-79 |
| RE 170-1 | Blood Decl. | 7197 |
| RE 171 | Objection of Arianna Gallagher | 7328-33 |
| RE 173 | Objection of Patrick S. Sweeney | 7336-46 |
| RE 174 | Objection of Christopher T. Cain | 7349-64 |
| RE 175 | Objection of Adam Brunet | 7366-73 |
| RE 176 | P&G Response | 7375-88 |
| RE 177 | Plaintiff's Response | 7408-39 |
| | April 16, 2018 Minute Entry | |
| RE 179 | Final Order | 8585-8620 |
| RE 180 | Judgment | 8621 |
| RE 185 | Cain Notice of Appeal | 8633-34 |
| RE 186 | Notice of Appeal | 8637-38 |



TRK# 8126 1490 0996

PRIORITY OVERNIGHT

45202
OH-US
CVG

XH LUKA

FTD 5102416 06SEP18 RKWA    546C1/F7BC/0C8A

RT 116  1
FZ     10:30   B
       0996
       09.07

For FedEx Ex_____ nly

Contents should be c_____ with the container and packed securely. For

**FedEx** Express    *Package*  US Airbill

FedEx Tracking Number **8126 1490 0996**

Form 0200    Recipient's Copy

**1 From**
Date 9-6-18

Sender's Name  Allen McDonald    Phone 865 246-0800

Company  Lacy Price + Wagner

Address  249 N. Peters Rd    Dept/Floor/Suite/Room

City  Knoxville    State  TN    ZIP  37923

**2 Your Internal Billing Reference**

**3 To**
Recipient's Name  Clerk    Phone

Company  U.S. District Court

Address  Potter Stewart Courthouse  Rm 103    Dept/Floor/Suite/Room

We cannot deliver to P.O. boxes or P.O. ZIP codes.

Address  100 E. Fifth Street
Use this line for the HOLD location address or for continuation of your shipping address.

City  Cincinnati    State  OH    ZIP  45202

Hold Weekday
☐ FedEx location address
REQUIRED. **NOT available for**
FedEx First Overnight

Hold Saturday
☐ FedEx location address
REQUIRED. **Available ONLY for**
FedEx Priority Overnight and
FedEx 2Day to select locations.

8126 1490 0996

**4 Express Package Service**    *To most locations.*    Packages up to 150 lbs.
For packages over 150 lbs., use the FedEx Express Freight US Airbill.

**Next Business Day**

☐ FedEx First Overnight
Earliest next business morning delivery to select locations. Friday shipments will be delivered on Monday unless Saturday Delivery is selected.

☒ FedEx Priority Overnight
Next business morning.* Friday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ FedEx Standard Overnight
Next business afternoon.*
Saturday Delivery NOT available.

**2 or 3 Business Days**

☐ FedEx 2Day A.M.
Saturday Delivery NOT available.

☐ FedEx 2Day
Second business afternoon.* Thursday shipments will be delivered on Monday unless Saturday Delivery is selected.

☐ FedEx Express Saver
Third business day.*
Saturday Delivery NOT available.

**5 Packaging**    *Declared value limit $500.

☐ FedEx Envelope*    ☐ FedEx Pak*    ☐ FedEx Box    ☐ FedEx Tube    ☐ Other

**6 Special Handling and Delivery Signature Options**  Fees may apply. See the FedEx Service Guide.

☐ Saturday Delivery
NOT available for FedEx Standard Overnight, FedEx 2Day A.M., or FedEx Express Saver.

☐ No Signature Required
Package may be left without obtaining a signature for delivery.

☐ Direct Signature
Someone at recipient's address may sign for delivery.

☐ Indirect Signature
If no one is available at recipient's address, someone at a neighboring address may sign for delivery. For residential deliveries only.

**Does this shipment contain dangerous goods?**
One box must be checked.

☒ No    ☐ Yes As per attached Shipper's Declaration.    ☐ Yes Shipper's Declaration not required.    ☐ Dry Ice  Dry Ice, 9, UN 1845 ___ kg

Restrictions apply for dangerous goods — see the current FedEx Service Guide.    ☐ Cargo Aircraft Only

**7 Payment**  Bill to:
Enter FedEx Acct. No. or Credit Card No. below.

☒ Sender
Acct. No. in Section
1 will be billed.    ☐ Recipient    ☐ Third Party    ☐ Credit Card    ☐ Cash/Check

Obtain recip.
Acct. No.

Total Packages    Total Weight  ___ lbs.    Credit Card Auth.

†Our liability is limited to US$100 unless you declare a higher value. See the current FedEx Service Guide for details.

Rev. Date 3/15 • Part #167002 • ©2012-2015 FedEx • PRINTED IN U.S.A.  RROA 00/00

644

fedex.com 1.800.GoFedEx 1.800.463.3339

Insert airbill here ▼